No. 63,230 ∎

Everett Glenn, *Appellant,* v. Dale Fleming, *Defendant,* and Aetna Casualty & Surety Company, *Appellee,* v. Randall Weller, *Defendant.*

(799 P.2d 79)

 Opinion filed September 28, 1990.

*Jerry R. Palmer*, of Palmer, Marquardt & Snyder, of Topeka, argued the cause and was on the briefs for appellant.

*H. Lee Turner*, of Turner & Boisseau, Chartered, of Great Bend, argued the cause, and *Donald A. McKinney*, of the same firm, was on the briefs for appellee.

The opinion of the court was delivered by

Six, J.: This case, arising from a claim of an insurer's bad faith refusal to settle a personal injury lawsuit, is before us on petitions for review of the judgment of the Court of Appeals. *Glenn v. Fleming*, 14 Kan. App. 2d 62, 781 P.2d 1107 (1989). Everett Glenn appeals from a summary judgment entered against him in his garnishment action against Aetna Casualty & Surety Company (Aetna). Glenn attempted to collect a judgment in excess of defendant Dale Fleming's automobile liability insurance policy limits. Fleming was insured by Aetna. The action is grounded on Glenn's claim of Aetna's bad faith in failing to discharge its duty to policyholder Fleming.

We shall consider: (1) summary judgment; (2) the measure for accrued interest running on Glenn's judgment; and (3) insurer-insured relationships arising from an insurer's alleged breach of its duty to settle.

Our consideration of these areas requires us to revisit the question of the validity of an assignment of an insured's rights in a liability insurance policy recently discussed in *Heinson v. Porter*, 244 Kan. 667, 772 P.2d 778 (1989).

## The Issues on Appeal

Glenn urges us on review of the Court of Appeals' decision: (1) to alter the impact of *Heinson* on his right to garnish Aetna; (2) to rectify asserted error by the Court of Appeals in affirming the trial court's ruling on Aetna's motion for summary judgment; and (3) to correct alleged error in the Court of Appeals' ruling

that the running of interest on Glenn's judgment against Fleming terminated when Aetna paid the sum of $25,000 into court.

Aetna petitions for review to reverse the Court of Appeals decision regarding accrued interest, contending Glenn is asserting a new contract claim. Aetna argues the claim was not raised in the trial court and, consequently, it may not be considered for the first time on appeal.

We have three questions for resolution:
(1) Whether the trial court erred in granting Aetna's motion for summary judgment;
(2) whether the trial court erred in its ruling as to the amount of interest owing to Glenn; and
(3) whether the Court of Appeals' reliance upon *Heinson v. Porter*, 244 Kan. 667, should be affirmed.

We affirm the trial court in granting Aetna's motion for summary judgment. The Court of Appeals did not reach this issue in view of its reliance on *Heinson*.

We reverse the trial court and the Court of Appeals regarding the amount of interest owing to Glenn.

We overrule Syllabus ¶ 4 and the corresponding portions of *Heinson* that characterize an assignment of a bad faith claim by a defendant insured to a personal injury plaintiff as the assignment of a tort and, consequently, invalid. We approve the settlement practice use of a covenant not to execute, as more fully set out in the opinion.

### Facts

Dale Fleming drove his El Camino pickup to the Garden City Co-op to purchase propane gas. Everett Glenn, an employee of the Co-op, filled the propane tank on the vehicle. After the tank was filled, a vapor fire suddenly occurred. Glenn was severely injured. He required extensive hospitalization and treatment.

Fleming did not report this incident to Aetna. The investigations carried out by Farmland Industries, Inc., (the parent company of the Garden City Co-op) through an independent adjusting agency and an accident investigation firm determined that Glenn had overfilled the tank and that there were no defects in the tank. The independent adjusting agency concluded that the Co-op was solely liable for the accident. The insurance company for

the Co-op paid Fleming's medical expenses, lost wages, and property damage.

Glenn filed a personal injury action against Fleming, the Co-op, and the two manufacturers of the clothing he had been wearing. The petition was amended to include products liability claims against the alleged valve manufacturer.

Fleming contacted attorney Randy Weller. Weller contacted Aetna, informing it that Fleming wanted Weller as his attorney. Aetna hired Weller to investigate and defend the suit. The policy limits for this accident were $25,000.

Fleming gave a statement to Aetna reporting that the tank had been overfilled and that maybe static electricity had caused the fire. Fleming mentioned that his propane tank had been checked and that there was nothing wrong with it. He also stated that he did not feel he was in any way responsible for the accident. This information was included in Aetna's first internal report on the lawsuit. The internal report indicated that Fleming would be an average witness because he had difficulty in remembering the details of the incident. The report stated he was very honest and this would help the case.

Glenn's attorney, Jerry Palmer, told Weller and representatives of Aetna that he and Glenn were not really going after Fleming, but wanted to recover a substantial judgment from the "deep-pocket" defendants—the Co-op's insurer and the clothing companies. In August and September of 1982, Glenn and Aetna agreed to proceed informally with discovery, to work together on some of the investigation, and to share information and some costs. This understanding is reflected in various letters and in Aetna's intermediate internal report on the lawsuit.

Glenn's counsel made a November 3, 1982, settlement offer to Weller. The settlement letter stated that Reverend Reith had visited Glenn while Glenn was in the hospital. Reith had heard Glenn, at a time when Glenn was lucid, state that Fleming had struck the propane tank with a wrench, causing the spark which started the fire. Glenn offered to settle the case and dismiss Fleming from the suit for a payment of $25,000, receipt of the valves from the propane tank, and an opportunity to talk to Fleming informally. The offer was open for a period of two weeks. A copy of an affidavit by Reverend Reith was attached.

Weller discussed this letter with Aetna and Fleming. Fleming denied having had a wrench or hitting the tank. Weller advised Aetna that he had questions about the condition of Glenn, who was hospitalized in intensive care, when the statement was allegedly made. Weller reported that nothing he had discovered so far would open the door to the possibility of Fleming's liability.

On November 8, 1982, Weller informed Glenn's counsel that the offer had been passed on to Aetna. Weller stated that Fleming emphatically denied having had a wrench. Weller had no doubt that the tank had been overfilled and that the gas had escaped from a certain valve on the tank. The letter discusses the valves and how best to have them tested.

A representative of Aetna telephoned Glenn's attorney on November 18, 1982, to reject the $25,000 offer and to counteroffer $5,500. A counteroffer confirmation letter noted that Glenn's counsel had not yet had an opportunity to review the photographs of the pickup and propane tank, but that he should have the photographs through the normal course of discovery in mid-December. The $5,500 offer was held open until January 1, 1983.

The counteroffer was rejected by Glenn on December 6, 1982. Palmer stated that he thought Fleming had exposure and believed the initial offer had been fair. The letter also stated Aetna was now in line to pay the entirety of any excess verdict because it had rejected the opportunity to settle the case within its policy limits.

Discovery proceeded on the case. Glenn and Fleming responded to interrogatories. Glenn stated he had no recollection of the facts surrounding the accident, but that the action was initiated because his wife and his minister stated that he had said Fleming struck the tank or valve with a metal tool. Fleming stated that Glenn overfilled the tank and that the released gas ignited.

On January 30, 1984, a consulting engineer reported that he had examined the valves from Fleming's propane tank and discovered that one of them allowed substantial leakage.

Fleming was deposed. His story of the events surrounding the accident had not changed. He insisted that he had not been near the tank and had not touched the vehicle. He disagreed with the report that the valve leaked because he had continued to use the

tank with those valves for some time after the accident and had never had any problems with it.

Glenn's deposition was also taken. When Weller saw how severely burned Glenn was, he contacted Aetna. Aetna offered the $25,000 policy limits. Glenn rejected this offer, informing Aetna that it was too late and that Aetna previously had acted in bad faith.

On March 4, 1985, Weller sent Palmer a letter offering $25,000. The letter stated that the case had again been analyzed and that the testimony thus far made it clear that Fleming had done nothing whatsoever to cause Glenn's injuries. The policy limits were offered to avoid the expense and unpredictability of a trial.

Another offer was made by Aetna in June of 1985. The June offer was withdrawn after Brenda Ashmore, the passenger who had been in the El Camino, was located and interviewed. Fleming had not known her last name. Locating her had been difficult. Brenda told Weller that she remembered the incident. In her deposition, she testified that she remembered seeing Glenn take a wrench from Fleming and hit the tank. She also stated that Fleming had not hit the tank. Weller's letters to Fleming noted that Brenda's testimony was going to be very good for them and that he wished that Fleming's memory was as good.

On August 30, 1985, Aetna wrote Palmer again offering the $25,000. The letter stated that Weller and Aetna did not understand how Palmer could believe that there was a bad faith claim because even at this date it was not clear that Fleming had been at fault.

On October 29, 1985, Palmer called Weller and told him that settlements had been reached with the valve company and all of the other defendants except Fleming. He again indicated that he believed Aetna would be liable for any judgment in excess of the policy limits because it had negotiated in bad faith. The total amount of the settlements was $695,000.

On November 14, 1985, Weller wrote to Palmer stating that Weller and Aetna's legal department had researched the bad faith allegation and had concluded that there was no basis for it. However, Aetna was again offering the $25,000.

The case was tried to a jury with Fleming as the sole defendant in May of 1986. Fleming did not allege the comparative fault of the defendants who had settled.

Reverend Reith testified that he had visited Glenn in the intensive care ward and that Glenn had said that he wished the "young man had not hit the valve with a wrench."

Brenda Ashmore testified that Glenn took a wrench from Fleming and tapped the valve, causing the fire. On cross-examination, she became confused. She contradicted her own story.

Fleming's testimony followed Brenda's. He told the jury that Glenn hit the valve with something, although he denied ever having had a wrench or having given one to Glenn. His testimony was different from his previous statements. He was impeached during cross-examination through comparisons of his earlier statements and deposition with his testimony at trial. It was evident that Fleming did not remember many of the details of the incident. He was also asked if he was trying to conform his testimony to what Brenda had said earlier at trial.

During the closing argument, Glenn's counsel attacked the credibility of Brenda and Fleming. He pointed out that Glenn was a cautious man with a family and that Fleming was young and careless and did not even know the last name of his girlfriend. He focused on the many discrepancies and gaps in Fleming's statements and argued that Fleming was unconcerned about this case and had not told the truth.

The jury found Glenn to be 30% and Fleming to be 70% at fault for the accident. The total verdict was $1,500,000. The verdict reduced by 30% was $1,050,000. The case was appealed to this court on the questions of whether the fault of the defendants who had settled should have been compared and whether the trial court should have reduced the judgment by the $695,000 settlement. This court held that the fault of the settling defendants could not be compared because their fault had not been alleged and that the judgment should not be reduced by the settlement amount. *Glenn v. Fleming*, 240 Kan. 724, 732 P.2d 750 (1987) (*Fleming I*).

In May of 1986, Fleming signed a covenant not to execute with Glenn. In this covenant, Fleming assigned all of his contractual rights with Aetna under his policy to Glenn. Glenn agreed

not to execute upon or impose liens on any other property of Fleming, either real or personal, tangible or intangible, or presently owned or after acquired.

In June of 1986, Glenn filed a praecipe for garnishment against Aetna. Aetna admitted to owing the $25,000, its maximum coverage, plus applicable costs through its policy, but denied liability for any judgment in excess of that. Aetna's amended answer stated it would "hold the above-described monies or other items in its possession until further order of the court." Glenn responded that Aetna was liable for the entire judgment because it had acted in bad faith and negligently during investigation and settlement negotiations.

The dispute over bad faith continued for the next two years. Numerous motions were made and hearings were held. Voluminous pleadings were filed. Expert witnesses were consulted and depositions were taken. The record on appeal consists of 26 volumes.

The following proceedings are relevant.

In July of 1987, Aetna was given permission to file a third-party petition against its attorney, Weller. This petition alleged that Weller had handled the defense of Fleming negligently and was liable for any judgment rendered against Aetna in the bad faith action by Glenn. The attorney malpractice issue was later bifurcated from the garnishment action and does not present an issue for this appeal.

Summary judgment motions were filed by both parties. The trial court denied Glenn's motion, finding that substantial triable issues of fact existed.

Glenn filed a general response to Aetna's motion, stating that the number of uncontested facts was too great to respond to each individually. Glenn asserted that analyzing the statements and presenting documentation to controvert them would not be helpful to the court.

Glenn responded to Aetna's subsequent motion for partial summary judgment and did address the uncontroverted facts paragraph by paragraph.

On July 1, 1988, during a hearing on both of Aetna's summary judgment motions, a pretrial conference was held.

Glenn's counsel agreed to abandon the negligent investigation and defense claims against Aetna and to proceed only on the theory of bad faith.

The trial court, on September 13, 1988, informed counsel by letter that it was granting Aetna's first motion for summary judgment. The court adopted as its own the arguments and statements of uncontroverted facts advanced by Aetna. Aetna's counsel was instructed to journalize the court's decision.

After reviewing suggestions from counsel, including differing views concerning the accrual of interest on the judgment, the court set out the language to be included in the journal entry.

Glenn appealed the court's decisions denying his motion for summary judgment, sustaining Aetna's motion for summary judgment, and accruing interest on $25,000 only from the date of the judgment in the garnishment action. Aetna filed a general cross-appeal.

The Court of Appeals relied on *Heinson v. Porter,* 244 Kan. 667, 772 P.2d 778 (1989), in deciding the instant case. The Court of Appeals reasoned that the existence of the covenant not to execute released Fleming from liability for the judgment, which nullified the basis for the garnishment action. *Glenn v. Fleming,* 14 Kan. App. 2d 62, 67, 781 P.2d 1107 (1989).

### Summary Judgment

A threshold to any analysis of a summary judgment issue is the recitation and acknowledgment of the movant's burden and of our standard of appellate review.

A moving party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. The record must also reflect that the moving party is entitled to judgment as a matter of law. *Peoples Nat'l Bank & Trust v. Excel Corp.,* 236 Kan. 687, Syl. ¶ 5, 695 P.2d 444 (1985). The burden of proving that no genuine issue of material fact exists is on the moving party. The record is viewed in the light most favorable to the party against whom the motion is directed. The granting of summary judgment is improper where there are genuine issues of material fact which are undetermined. *Willard v. City of Kansas City,* 235 Kan. 655, 657, 681 P.2d 1067 (1984). If factual issues do exist, they must

be material to the case to preclude summary judgment. *Bacon v. Mercy Hosp. of Ft. Scott,* 243 Kan. 303, 306-07, 756 P.2d 416 (1988).

On opposing a motion for summary judgment, a party must come forward with something of evidentiary value to establish a material dispute of fact. *Slaymaker v. Westgate State Bank,* 241 Kan. 525, 531, 739 P.2d 444 (1987); Supreme Court Rule 141(b) (1989 Kan. Ct. R. Annot. 94). See K.S.A. 1989 Supp. 60-256(e).

At the summary judgment hearing, Glenn waived his negligence claims against Aetna and proceeded only on the bad faith claim. The trial court's findings of fact, conclusions of law, and judgment (consisting of 26 pages, 42 findings of fact, and 40 conclusions of law) recite several separate reasons for granting summary judgment to Aetna. The trial court found that Aetna had not acted in bad faith at the time the settlement offer was made by Glenn. The trial court also held that Glenn was barred from recovering any excess judgment from Aetna due to the misconduct of Fleming and of Glenn.

An insurance company may become liable for an amount in excess of its policy limits if it fails to act in good faith and without negligence when defending and settling claims against its insured. When an insurer determines whether to accept or reject an offer of settlement, it must give at least the same consideration to the interests of its insured as it does to its own interests. See *Rector v. Husted,* 214 Kan. 230, Syl. ¶¶ 1, 2, 519 P.2d 634 (1974); *Bollinger v. Nuss,* 202 Kan. 326, 449 P.2d 502 (1969).

The question of an insurer's liability for an excess judgment depends upon the circumstances of the particular case and must be determined by taking into account the various factors present rather than on the basis of any general statement or definition.

The conduct of the insurer must not be viewed through hindsight. Instead, the offer and the strength of the plaintiff's case must be viewed as they fairly appeared to the insurer and its agents and attorneys at the time the offer was refused. *Rector,* 214 Kan. at 239; *Bollinger,* 202 Kan. at 341.

An insurance company acting honestly and in good faith upon adequate information should not be held liable because it failed to prophesy the result. Something more than mere error of judg-

ment is necessary to constitute bad faith. *Bollinger,* 202 Kan. at 341.

Glenn's bad faith allegation is based solely on his November 3, 1982, letter which contained the affidavit of Reverend Reith and the offer to settle for the $25,000 policy limits.

At the time this offer was made, the case was less than four months old. Discovery had scarcely begun. There were several defendants. The negligence claims were difficult to investigate because the accident had happened two years earlier. No report of the incident was submitted to Aetna until suit was filed. Neither Glenn nor Fleming had completed interrogatories. Depositions had not been taken. The valves from the propane tank had not been tested. Fleming had stated unequivocally that he had not done anything to cause the fire. All of the early investigative reports, including those from independent entities, had concluded that Glenn was entirely at fault for overfilling the tank and causing the fire.

The affidavit of Reverend Reith was the only indication that Fleming might be connected to the cause of the accident. Aetna and Weller had serious doubts about the reliability of the statement. Glenn had been in intensive care at the time he reportedly gave the statement. He was believed to have been heavily medicated. The record indicates that Aetna had requested Glenn's medical records in August of 1982 and that Glenn's attorney had said that he would send them. The medical information, however, was not sent to Aetna and it was not possible at the time of the offer for Aetna to utilize Glenn's records in evaluating his condition.

Also, at this time, Glenn and Aetna were still cooperating and carrying on an informal discovery process. Aetna had expressed to Palmer the intention of settling for the policy limits if evidence developed which cast a shadow on Fleming. Aetna and Weller believed that the relations between the parties were on a friendly basis. They understood that they could always decide to settle for the policy limits later after more discovery had taken place. Weller had informed Aetna that there was no evidence thus far indicating that Fleming might be liable and advised Aetna to reject the offer.

The trial court found that there was no bad faith in refusing to accept the November 3, 1982, offer under these circumstances. The trial court further found that the offer itself was unreasonable and that bad faith liability could not arise from the failure to accept an unreasonable offer. The offer was found to be unreasonable because it was premature, had conditions attached to it, and was only open for two weeks.

The trial court's decision to grant Aetna summary judgment on the bad faith claim was proper.

We note that the trial court's decision to grant summary judgment to Aetna listed several alternative grounds for the determination and two additional reasons why Glenn could not recover on his bad faith claim. Because we have disposed of the summary judgment issue, we need neither rule on these additional reasons nor consider the alternate grounds.

After the garnishment proceeding was initiated, Aetna filed a third-party petition against Weller. Aetna alleged that Weller had been negligent in handling the defense of Fleming in the lawsuit filed by Glenn.

On the basis of the third-party claim, Glenn moved for summary judgment against Aetna in the garnishment action. The trial court denied Glenn's motion for summary judgment and the Court of Appeals affirmed. Our affirmance of Aetna's summary judgment also resolves Glenn's motion.

### Amount of Interest

On remand from this court (after *Fleming I*), the trial court entered judgment on August 27, 1987, on behalf of Glenn against Fleming in the amount of $1,050,000 with "interest at the legal rate from May 21, 1986, and costs."

Glenn initiated the garnishment phase of the Aetna-Fleming-Glenn relationship by requesting, through his praecipe, that an order of garnishment issue upon Aetna in satisfaction of his judgment against Fleming.

After Aetna's summary judgment motion had been granted, Glenn's counsel, in his letter of October 28, 1988, to the trial judge, noted that the journal entry should state "judgment is entered against Aetna in favor of Plaintiff for the sum of $25,000 with interest at the legal rate *from the date of the entry of judgment in this case until paid.*" (Emphasis added.) Aetna's coun-

sel, in his response of November 8, 1988, objected to that phrase. The objection to Glenn's language centered on the phrase "from the date of the entry of judgment in this case."

Aetna's counsel identified the point of disagreement by noting: "If Mr. Palmer is speaking of the date of entry of judgment in the garnishment proceeding, we have no problem with this. If, however, we are talking about the date of entry of judgment in the underlying tort action, this is highly objectionable."

The trial judge did not agree with Glenn's position. He informed counsel by his letter of December 12, 1988, that the judgment of the court should read: "that judgment is entered against Aetna in favor of plaintiff for the sum of $25,000 *with interest from the date of this judgment on the garnishment action at the legal rate until paid.*" (Emphasis added.) The journal entry reflects the language of the trial judge's letter.

Glenn argues that Aetna should be liable for interest on the entire amount of the $1,050,000 judgment from May 21, 1986, the date it was entered. Glenn relies on the supplementary payments section of Fleming's Aetna policy and on our decision in *Stamps v. Consolidated Underwriters,* 208 Kan. 630, 493 P.2d 246 (1972). Neither the *Stamps* case nor the supplementary payments language of the Aetna policy were cited to the trial court. The preferred procedure would have been to specifically direct the trial court's attention to the case law and the pertinent policy language.

Aetna counters that Glenn's "accrued interest from the date of judgment" assertion is a contract claim being raised for the first time on appeal.

Aetna argues that Glenn's claim for interest on the entire amount of the judgment may not be considered on appeal because Glenn did not raise the issue in the trial court. The Court of Appeals concluded that the record supported a "sufficient claim for interest based on the insurance contract." *Glenn v. Fleming,* 14 Kan. App. 2d at 69. The Aetna policy was in the record before the trial court. *Stamps,* which construed language almost identical to the language of the Aetna policy, had been the case law of this jurisdiction since 1972. We agree with the Court of Appeals that the interest issue is properly preserved for appeal.

Having concluded that the Court of Appeals was correct in its holding that the issue was properly preserved for appeal, we now turn to the question of interest. Three measurements have been advanced:

(1) *The measurement utilized by the trial court and endorsed by Aetna.* (The amount upon which interest is earned is limited to $25,000, at the legal rate, from the date of the garnishment judgment [September 13, 1988] until paid.)

(2) *The measurement utilized by the Court of Appeals.* (The amount upon which interest is earned is "the entire verdict rendered against Fleming [$1,050,000] from the date of that judgment [May 21, 1986] until the date the policy limit [$25,000] was paid to the court [June 30, 1989]." 14 Kan. App. 2d at 70.)

(3) *The measurement advanced by Glenn on appeal.* (The amount upon which interest is earned is the entire verdict of $1,050,000 from the date of judgment [May 21, 1986] until all interest and the policy limits of $25,000 have been paid. The $25,000 payment of the policy limits by Aetna on June 30, 1989, should be deemed a partial payment against the accrued interest.)

Interest continues to accrue according to the Glenn analysis until such time as Aetna, under the supplementary payments language of its policy, has "paid or tendered or deposited in court" the amount of the policy limits, plus interest on the whole judgment.

We agree with the position on accrued interest advanced by Glenn. Our conclusion is dictated by the precedent of *Stamps.*

The "Supplementary Payments" provision in the Aetna policy insuring Fleming provides Aetna will:

"pay in addition to the applicable limits of liability:

"(a) all expenses incurred by the Company, all costs taxed against the insured in any such suit and *all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the Company has paid or tendered or deposited in court* that part of the judgment which does not exceed the limit of the Company's liability thereon." (Emphasis added.)

This clause is a standard provision contained in many liability insurance policies. Consequently, numerous court decisions have interpreted either nearly identical or similar policy language. The majority of cases have held that the insurer is obligated to pay

interest on the entire judgment, irrespective of the policy limits. Annot., 76 A.L.R.2d 983.

In *Stamps* we held:

"A so-called standard interest clause in a liability insurance policy is considered and construed to create liability for interest on the entire judgment awarded so as to render the insurer liable for such interest until the amount of the policy limit, *plus interest on the whole judgment,* has been tendered, offered or paid." (Emphasis added.) 208 Kan. 630, Syl. ¶ 2.

*Stamps* stated the rule clearly that interest continues to run until the amount of the policy limits, plus interest on the whole judgment, is tendered. Commissioner Harman, speaking for a unanimous court, thoroughly analyzed the issue now before us. We adopted the majority rule and characterized the standard interest clause "so as to render the insurer liable for such interest until the amount of the policy limit, *plus interest on the whole judgment, has been tendered, offered or paid."* (Emphasis added.) 208 Kan. at 633.

Aetna paid $25,000 into court on June 30, 1989. It is unnecessary to determine when Aetna "has paid or tendered or deposited in court" the policy limits pursuant to the supplementary payments section of its policy. The payment or tender of only the policy limits was insufficient to stop the running of interest on the entire "amount of any judgment."

*Heinson v. Porter* Overruled

The trial court's decision granting Aetna's motion for summary judgment was prior to our April 14, 1989, decision in *Heinson v. Porter,* 244 Kan. 667, 772 P.2d 778 (1989). The Court of Appeals decision relied on *Heinson.*

Granting the petitions for review requires us to revisit *Heinson* and the bad faith/tort/contract relationships that arise in liability insurance contract litigation.

Syllabus ¶ 4 of *Heinson* and the corresponding portions of that opinion that are contrary to this opinion are overruled.

The rationale for this shift is expressed by posing and answering three inquiries:

(1) Whether an insurer's breach of the duty to act in good faith and without negligence in defending and settling claims against its insured is a tort or a breach of contract.

(2) Whether a bad faith and negligent defense claim is assignable.

(3) Whether a plaintiff who has entered into a covenant not to execute against an insured is precluded from garnishing the insurer in an amount in excess of the policy limits.

## Breach of Duty: Tort or Contract?

We first addressed the issue whether an insurer's breach of the duty to act in good faith and without negligence in defending and settling a claim against its insured is a tort or a contract action in *Gilley v. Farmer,* 207 Kan. 536, 485 P.2d 1284 (1971). In *Gilley,* the plaintiff (three cases were referred to as a single case) had a judgment against an insured in excess of the policy limits. He initiated garnishment proceedings against the insurer, alleging bad faith and negligence in handling the claim on behalf of the insured defendant. The insurer argued "whatever cause of action Farmer [insured] may have to recover for the excess judgment . . . is grounded in tort" and not subject to a garnishment. 207 Kan. at 542. We rejected that argument, applying general contract and negligence rules. 207 Kan. at 543.

We observed: "*Implicit* in the *usual* liability insurance policy is a covenant on the part of the insurer that, in defending or settling a claim against its insured, it will act in good faith and with reasonable care for his interests." (Emphasis added.) 207 Kan. at 543. We noted that even a claim exceeding the policy limits sounds in contract:

"[W]e see little distinction in principle between a garnishment proceeding to establish an indebtedness within policy limits and one to establish an indebtedness outside these limits arising from a breach of the insurer's duty to exercise reasonable care and good faith in settling a claim against the insured. *In either case the action sounds in contract.*" (Emphasis added.) 207 Kan. at 543-44.

Nine years later, we discussed various cases concerning actions against an insurer for bad faith and negligence in defending a claim against an insured. We stated: "These cases indicate plaintiff Guarantee [insured] could have a good cause of action against Interstate [insurer] in *its tort action.*" (Emphasis added.) *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.,* 228 Kan. 532, 537, 618 P.2d 1195 (1980) (*Guarantee I*).

Guarantee Abstract, on remand for a new trial, presented the case as a tort action and recovered punitive damages. The case was appealed. *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*, 232 Kan. 76, 652 P.2d 665 (1982) (*Guarantee II*). We reversed the award of punitive damages, holding that punitive damages are not recoverable for the breach of an insurance contract in the absence of an independent tort. We reasoned that both the duty to settle and duty to appeal, if any, arise from the insurer's express contractual undertaking to defend any suit filed against the insured. Consequently, a claim that the duty to settle has been breached sounds in contract. We admitted that *Guarantee I* inadvertently, but erroneously, referred to Guarantee's claim of negligent defense as a tort action and disapproved of that portion of the *Guarantee I* opinion. We stated that negligent performance of an insurer's contractual duty to defend is a breach of contract.

In *Guarantee II*, we attempted to clarify "an area of possible confusion of terminology." 232 Kan. at 80. We referred to the terms "good faith," "fair dealing," "without negligence," and "due care" by observing "[a]ll of these terms are simply statements of the contractual obligation an insurer undertakes under a duty to defend. They do not create a new cause of action or authorize a different measure of damages. They merely seek to broaden the conduct which constitutes breach of contract." 232 Kan. at 80.

In *Guarantee II*, we rejected the idea that any insurance contract duties, whether the duty to defend, the duty to settle, or otherwise, are duties "imposed by law." We stated all such duties are duties "arising under or imposed by agreement," and, if breached, the action lies in contract. 232 Kan. at 79. We also reiterated that the tort of bad faith is not recognized in Kansas. 232 Kan. at 79. After *Guarantee II*, commentators considered Kansas a jurisdiction in which a breach of the duty to settle sounded in contract. Jerry, *Recent Developments In Kansas Insurance Law: A Survey, Some Analysis, and Some Suggestions*, 32 Kan. L. Rev. 287, 300 (1984).

In *Heinson v. Porter*, 244 Kan. 667, we stated that bad faith and breach of fiduciary duty are tort claims. *Heinson* did not refer to either *Guarantee I, Guarantee II,* or *Gilley.* Breach of

fiduciary duty is a tort; however, we have not recognized this tort in a bad faith and negligent defense action against an insurer.

*Heinson* stated (1) tort claims are not assignable (therefore, Heinson acquired no rights from the assignment), and (2) Kansas does not recognize an independent tort of bad faith. 244 Kan. at 674-75. Although these statements reflect correct rules of law, the statements are not germane to the instant case.

We affirm the rationale of *Guarantee II* that a wrongful failure to settle arises from the insurer's contractual obligation to defend. An action to enforce that obligation is accordingly based on breach of contract. 232 Kan. at 78.

We have adopted, in our development of the substantive case law, the principle that the insurer's duties are contractually based and then approved a tort standard of care for determining when the contract duty has been breached. Perhaps this contract/tort relationship has contributed to the confusion arising from our efforts to describe the duty of good faith and to identify the situations involving bad faith/negligent duty to settle and to defend. From *Bennett v. Conrady,* 180 Kan. 485, 305 P.2d 823 (1957), and *Bollinger v. Nuss,* 202 Kan. 326, 449 P.2d 502 (1969), forward, we have used "negligence," "due care," and other tort expressions to describe the substance of what is a contract duty.

### Is a Claim of Bad Faith or Negligence Based on a Wrongful Failure to Settle Assignable?

Prior to *Heinson,* we had not previously considered whether bad faith and negligent defense claims are assignable. We have held that a breach of contract claim is assignable. *Alldritt v. Kansas Centennial Global Exposition,* 189 Kan. 649, 657, 371 P.2d 181 (1962). In *Life Insurance Co. v. Kelso,* 16 Kan. 481, 485 (1874), we held that a first-party claim for damages against a life insurance company for breach of an insurance contract was assignable.

The weight of authority favors the assignment of an insured's right of recovery against the insurer for the wrongful refusal to settle a claim within the policy limits. *DiMarzo v. American Mutual Ins. Co.,* 389 Mass. 85, 93 n.8, 449 N.E.2d 1189 (1983) ("overwhelming weight" of authority, according to the Massachusetts Supreme Court); and *Kagele v. Aetna Life,* 40 Wash. App. 194, 197, 698 P.2d 90 (1985). See Annot., 12 A.L.R.3d 1158;

Jerry, Understanding Insurance Law § 25G[d], p. 125 (1987); Shernoff, Gage & Levine, Insurance Bad Faith Litigation § 3.06[1] p. 3-33 (Matthew Bender 1990); and Wall, Litigation and Prevention of Insurer Bad Faith § 7.02, pp. 245-46 (1985).

The arguments against permitting such assignments are: (1) Bad faith and negligent defense actions are tort actions which are unassignable because they are personal to the insured; (2) bad faith actions are mere contingencies or possibilities and are not assignable (particularly when the assignment occurs before the injured party obtains a judgment on his personal injury claim); (3) such assignments will foster fraud and collusion between the insured and the injured plaintiff; and (4) upholding assignments arms the injured party with a disproportionate unfair advantage which will pressure the insurer into making unwarranted settlements at the policy limits. See 12 A.L.R.3d at 1159-60.

The first argument is not applicable to our discussion. As we have previously noted, bad faith and negligent defense actions are contract actions, not tort actions. The remaining objections to assignment were considered and rejected in *Critz v. Farmers Ins. Group*, 230 Cal. App. 2d 788, 41 Cal. Rptr. 401 (1964), and *Gray v. Nationwide Mut. Ins. Co.*, 422 Pa. 500, 223 A.2d 8 (1966). We agree with the resolutions of *Critz* and *Gray* that the remaining objections are not persuasive.

The arguments for permitting assignments of bad faith and negligent defense actions are: (1) Breach of contract actions are not personal to the insured; (2) the insured is prevented from filing bankruptcy when faced with an excess judgment; (3) the injured plaintiff is compensated; (4) settlements between the injured plaintiff and the insured are fostered; (5) the injured plaintiff is allowed to sue the insurer directly, thus simplifying the process; and (6) the possibility of collusion between the injured plaintiff and the insured is not increased. 12 A.L.R.3d at 1161-63. For a discussion endorsing assignment, see Flannagan, *Assignability of Insured's Cause of Action for Bad Faith or Negligent Refusal to Settle*, 38 J.K.B.A. 297 (1969).

We hold that an insured's breach of contract claim for bad faith or negligent refusal to settle may be assigned.

### May A Plaintiff Holding an Assignment of a Bad Faith Claim and a Covenant Not to Execute Garnish the Insurer for an Excess Judgment?

This court, in *Heinson v. Porter*, 244 Kan. 667, refused to grant an excess judgment to Heinson (plaintiff-garnishor). After a series of reservation of rights letters denying coverage which were withdrawn and reissued, Metropolitan (insurer-garnishee) brought a declaratory judgment action against Porter (insured-defendant) to determine whether there was coverage. Metropolitan neither joined Heinson in the action nor notified him during its pendency. Porter and Metropolitan settled the declaratory judgment action with the following terms: (1) Metropolitan would pay Porter $500 in attorney fees for defending the action and taking her through bankruptcy; and (2) Porter stipulated that there was no coverage and gave a total release to Metropolitan. After this settlement and almost one year after notification and assumption of defense of the lawsuit, Metropolitan withdrew its defense of Porter. Subsequently, Heinson and Porter settled their action for personal injury. The settlement provided that: (1) $500,000 be awarded to Heinson; (2) Porter assign to Heinson all of her claims against Metropolitan; and (3) Heinson would look only to Metropolitan for payment and would never seek collection of the judgment from Porter. Heinson filed a garnishment action against Metropolitan. The trial court found that Metropolitan had breached the duty to act in good faith in defending the claim and entered judgment for Heinson for $500,000.

We held that Metropolitan was estopped to deny coverage, but affirmed the district court only as to the $100,000 policy limits. We reversed as to the $400,000 in excess of the policy limits, stating that Porter assigned a tort claim and that Heinson acquired no rights from the invalid assignment. We reasoned that liability in excess of the policy limits is limited to the actual damage suffered by Porter as a result of Metropolitan's wrongful conduct. We then found that Porter had suffered no actual damages. We advanced two rationales. First, because Heinson agreed to never seek collection against Porter, Porter had no liability to Heinson for the $400,000 excess. Second, Heinson did not offer to settle for the $100,000 policy limits until almost a year after the Heinson/Porter settlement judgment was entered. Thus, Met-

ropolitan's refusal to settle was not a factor in the excess judgment being entered and caused no damage to the insured.

The Court of Appeals, in the instant case, relied on *Heinson*. It held that a covenant not to execute precluded Glenn from garnishing Aetna. The covenant between Glenn and Fleming was exchanged for Fleming's assignment of his claim against Aetna for wrongful refusal to settle within policy limits. The Court of Appeals concluded that Fleming had no actual damages because the covenant not to execute frees him of liability for the payment of any judgment to Glenn. Aetna would, therefore, not be liable for any payment of the excess judgment, regardless of whether it acted in bad faith during settlement negotiations. *Glenn v. Fleming*, 14 Kan. App. 2d 62, 67, 781 P.2d 1107 (1989).

The Glenn-Fleming assignment and covenant not to execute was entered into after a jury returned a verdict against Fleming in excess of the policy limits. The Glenn-Fleming relationship differs from *Heinson* in two respects. First, in *Heinson* the covenant was agreed to before judgment was entered. Second, in *Heinson* the insured and the injured party agreed to the amount of the judgment.

We have previously considered and rejected an insurer's contention that a bad faith or negligence claim for failure to settle within the policy limits could not be asserted against the insurer when the insured was insolvent. *Farmers Ins. Exchange v. Schropp*, 222 Kan. 612, 567 P.2d 1359 (1977). In that case, the insurer reasoned that an insolvent insured could not be harmed by the entry of an excess judgment since the insured has no assets with which to pay the judgment. This court moved forward to protect the rights of the insured by adopting the "judgment rule" and rejecting the "prepayment rule."

The "prepayment rule" requires that payment of the excess judgment is a condition precedent to an action against the liability carrier for the excess liability. The "judgment rule" does not require payment. Farmers contended that it was not obligated to exercise good faith in order to settle damage claims within the policy limits when the insured is bankrupt, insolvent, *or otherwise judgment proof*. 222 Kan. at 623. We held the prepayment rule did not serve the ends of justice:

"On the contrary, we see no reason why the insolvency of an insured or his estate should excuse the insurer from exercising the same good faith it would be expected to exercise, were the insured fully financially responsible. Further, an insured need not wait until his property is seized under an excess judgment before commencing action against an insurer whom the insured claims has acted negligently or in bad faith in failing to settle a claim within the policy limits. The action lies, whether or not the insured has paid or can pay an excess judgment." 222 Kan. at 624.

A majority of courts permit the use of covenants not to execute. One line of reasoning concludes that a covenant is not a release of liability. See *Crabb v. Nat'l Ind. Co.*, 87 S.D. 222, 232, 205 N.W.2d 633 (1973) (assignment relieved defendant from responsibility to satisfy judgment which remained of record); *Ammerman v. Farmers Insurance Exchange,* 22 Utah 2d 187, 188-89, 450 P.2d 460 (1969) (assignment provided that, regardless of the outcome of assignee's suit against the insurer, the defendant's obligation to plaintiff-assignee would be satisfied); and *Kagele v. Aetna Life,* 40 Wash. App. at 198 (a covenant not to execute coupled with an assignment will not permit an insurer to escape its obligation).

Other courts reason that the insured is entitled to use reasonable means to avoid personal liability. See *Metcalf v. Hartford Acc. & Ind. Co.*, 176 Neb. 468, 126 N.W.2d 471 (1964); *Griggs v. Bertram,* 88 N.J. 347, 443 A.2d 163 (1982); *American Family Mut. Ins. Co. v. Kivela,* 408 N.E.2d 805 (Ind. App. 1980); *Miller v. Shughart,* 316 N.W.2d 729 (Minn. 1982); and *First Nat'l Indem. Co. v. Mercado,* 511 S.W. 2d 354 (Tex. Civ. App. 1974).

The primary argument against permitting the use of covenants not to execute rests upon the concern that their use will impart a collusive character to a personal injury suit. A similar argument as presented by Aetna here was noted and rejected in *Gray v. Nationwide Mut. Ins. Co.*, 422 Pa. at 510, and *Critz v. Farmers Ins. Group,* 230 Cal. App. 2d at 802.

Prejudgment covenants not to execute have been approved in *Damron v. Sledge,* 105 Ariz. 151, 460 P.2d 997 (1969); and *Griggs v. Bertram,* 88 N.J. 347.

It would be highly unusual for fraud or collusion to taint the amount of the judgment when, as in the Glenn-Fleming situation, the assignment/covenant is executed after a jury verdict. In the

situation where the case is litigated at trial before the entry of judgment, the amount may be assumed to be realistic.

We do express concern over the reasonableness of assignment/covenants in which the amount of the judgment assigned has been determined by agreement of the parties.

In this type of consent judgment case the settlement between the plaintiff and the insured may not represent an arm's length determination of the value of the plaintiff's claim.

As a prescription for this concern, we adopt the burden of proof resolution put forth by the Supreme Court of New Jersey in *Griggs v. Bertram*, 88 N.J. 347, and endorsed in *Steil v. Fla. Physicians' Ins. Reciprocal*, 448 So. 2d 589, 592 (Fla. Dist. App. 1984).

*Griggs* protected the insurer from collusion by holding that the insurer may challenge the settlement in an action against the insurer to enforce the insurance contract. The *Griggs* court noted the majority rule on the burden of proof is that settlement is presumptive evidence of the liability of the insured. The entire burden of proof is on the insurer to show that the settlement was not reasonable. 88 N.J. at 365-66.

*Griggs* deviated from this rule and placed the initial burden on the insured to make a prima facie case by producing evidence relating to good faith and reasonableness of the settlement. The ultimate burden of proving that the settlement was made in bad faith or that it was unreasonable would then rest with the insurer. 88 N.J. at 367.

A nonjury verdict judgment may be enforced against an insurer contingent upon proving bad faith or negligence in a refusal to settle. The assignment/covenant not to sue may be utilized if the judgment is reasonable in amount and entered into in good faith.

We endorse the reasoning of the New Jersey Supreme Court in *Griggs*:

"We therefore hold that a settlement may be enforced against an insurer in this situation only if it is reasonable in amount and entered into in good faith. The initial burden of going forward with proofs of these elements rests upon the insured and the ultimate burden of persuasion as to these elements is the responsibility of the insurer. This rule reasonably accommodates and compromises the competing interests of the parties and considerations of public policy. It will discourage collusive or overreaching impositions upon insurance carriers and, at the same time, will be conducive toward en-

couraging settlement and protecting an insured in its efforts amicably to resolve a claim against it after having been abandoned by its carrier." 88 N.J. at 368.

A policy observation of the California court in *Critz* is appropriate:

"A major portion of today's litigation consists of personal injury actions defended by liability insurers. Settlement practices and timing have a direct effect on the quantity and flow of court business and thus on the administration of justice generally. Public policy permitting or proscribing tactical weapons developed by claimants and insurers should be shaped by two influences: (1) the public interest in encouraging settlements, and (2) fairness, that is, equalization of the contenders' strategic advantages." 230 Cal. App. 2d at 800.

Emphasis should be placed on the recognition that an insurer may avoid liability for bad faith by acting in good faith and, consequently, will sustain no excess judgment responsibility. The personal injury plaintiff or assignee will carry the burden of proof in proving to the trier of fact that the insurer exercised bad faith in refusing to settle within the policy limits.

Affirmed in part, reversed in part, and remanded for a determination of the specific amount owing; that is, the policy limit of $25,000 plus accrued interest on the entire verdict of $1,050,000 from the date of judgment, May 21, 1986, until the date Aetna pays the policy limit of $25,000 plus all interest due on the entire verdict. Aetna's $25,000 payment on June 30, 1989, is deemed a partial payment of accrued interest as of the date of that payment.

ABBOTT, J., not participating.

MCFARLAND, J., concurring in part and dissenting in part: I concur with that portion of the majority opinion that affirms the district court's determination that Aetna did not act in bad faith in its dealings with its insured. I disagree with the balance of the opinion.

The majority opinion first concludes the district court correctly entered summary judgment in favor of Aetna as the insurer did not act in bad faith with its insured. The majority then proceeds to determine whether or not the insured's claim for bad faith sounds in contract or tort and hence whether or not it could be assigned. Under the circumstances, the determination of these

issues is a gratuitous and improper appendage to the opinion in the case before us. It would appear that the majority has climbed a tree in order to overrule Syl. ¶ 4 of *Heinson v. Porter*, 244 Kan. 667, 772 P.2d 778 (1989).

I further disagree with the majority's determination that the issue of interest beyond ordinary judgment interest is properly before us. The pertinent facts are set forth in the majority opinion. Based upon those facts, I would reach the opposite conclusion.