This an appeal from summary judgment granted in favor of the defendants. We affirm.
William Arthur Brown was employed as a truck driver for Chem Haulers, Inc. At 2:30 p.m. on October 6, 1978, Brown began making several pick-ups and deliveries throughout Alabama and Georgia. When he returned to the Birmingham terminal the next day at 2:30 p.m., the terminal manager, Larry Kimbrough, asked Brown to pick up one more load even though he knew Brown was tired and had already driven in excess of his permitted number of hours. Kimbrough told Brown that he would not have to deliver the load, but would only have to return it to the terminal. Brown complied with Kimbrough's request. However, when he returned with the load to the terminal, the night dispatcher, John Sherman, threatened to fire Brown if he did not deliver the load to its final destination. Brown then left with the load and, as he was negotiating a turn through an intersection, the tractor/trailer overturned. Although the tractor/trailer and its contents burned, Brown escaped with only a back injury.
Brown was subsequently fired by Chem-Haulers. When his attempts to secure other employment as a truck driver proved futile, Brown sued Chem-Haulers, Kimbrough and Sherman. In his complaint, Brown alleged that as a proximate result of the defendants' negligence, i.e., ordering him to deliver the load when they knew he was fatigued, he was caused to wreck the tractor/trailer and thereby sustain injury. He also alleged that the defendants slandered and/or maliciously interfered with his employment contract rights by informing his prospective employers that his negligence was the cause of the accident and/or refusing to inform those prospective employers that the accident was the result of their ordering him to drive when he was physically exhausted. The defendants moved for summary judgment, supporting their motion with the pleadings, their answers to interrogatories and Brown's deposition. Brown appeals from the grant of that motion.
Brown concedes in brief that he did not state a viable negligence claim against Chem-Haulers, but insists that a valid claim was asserted against his co-employees, Kimbrough and Sherman.
Assuming that a cause of action was stated against his co-employees, Brown's deposition makes clear that summary judgment was properly entered against him on this aspect of his complaint. When questioned about the circumstances surrounding the accident, Brown stated: *Page 889 
 A. I pulled up to a red light, which it's — once you turn left there on Valley Road it's not but about two blocks up there to where Jay Bird turns off to the right. Well, I pulled up to the red light and I stopped and I made my right turn, which I was running approximately two, three, miles an hour, because I was in low gear when I started to make the turn. And, when I made the turn I started around, I felt the weight shift on the truck. When the weight shifted on the truck, I immediately counter-reacted by trying to get the truck to pull loose, which it didn't work. The truck then slid down in the gully and turned over and caught on fire and I crawled out the window and got out of it.
* * * * * *
 Q. Well, do you know what caused it to shift, other than you driving at too much of an angle?
 A. No, sir. The shoulder of the road could have gave away.
Q. Did it?
A. I've got no earthly idea.
 Q. Now, there wasn't any other vehicle involved; it was just you driving and turning that curve, —
A. Yes, sir.
 Q. — and you went off the pavement and turned over; is that right?
A. The trailer did.
 Q. Yes, sir. And when the trailer went off it in turn turned the whole rig over, didn't it?
A. It pulled the tractor and everything over.
Q. Yes, sir. All right. Were you awake?
A. I think I was; I hope I was.
Q. Well, you remember it all, don't you?
A. Yes, sir.
Thus, it is apparent that the accident was caused by the weight shift of the load. Although the exact cause of the weight shift is unknown, there is nothing in Brown's deposition testimony which would support an inference that the accident was in any way caused by his fatigue. In fact, Brown's testimony indicates that at the time of the accident he not only felt the load shift, but also had the presence of mind to "immediately counteract" by taking corrective measures.
Summary judgment was also properly entered against Brown on his claim that the defendants intentionally interfered with his employment contract rights. During his deposition, Brown stated that he attempted to secure employment as a truck driver with several firms. His testimony reflects, however, that with one exception either the prospective employer already knew of Brown's accident or he informed them of that fact during the application process. The one instance where his accident history was not known involved Brown's friend, Jerry Brown. Upon questioning, Brown stated:
 A. Well, one other job that I was going to see about, Jerry Brown is a friend of mine, —
Q. Is he a relative?
 A. No, sir. But, he's a friend of mine; he has his own truck. And, he was going to lease it in to a firm which pulls out of Texas, out of Brownsville, Texas. They've got a terminal there. He was going to lease his truck in to them and run double operation with me. He talked with the Safety Supervisor and stuff there, which in turn, Jerry told them to explain the situation to them, everything that happened and how it happened.
 Q. All right. So, your friend, Jerry Brown, told this company about your accident?
A. Right.
Q. All right. Okay.
 A. Okay. He told them the accident, what happened. The Safety man out there in turn told him that if Chem-Haulers would verify the story that he told, that it would be alright, that *Page 890 
he could accept us in, he would take the truck and me and him in, as me the second driver.
Q. Who was that man? You never did talk to him?
A. I never talked to him. Jerry talked to him.
* * * * * *
 Q. All right. Now, what else. Everything you heard about this transaction was what your friend, Jerry Brown, told you?
A. Yes, sir.
Q. All right. Go ahead.
 A. Well, they said that Chem-Haulers did not verify the same story that he told them.
* * * * * *
 Q. Now, in all of these applications, and of all of these conversations [with potential employers] I believe it's your sworn testimony, Mr. Brown, that not in any case did anybody say anything to you that any agent, servant, or officer of Chem-Haulers had said anything to them. You don't have a single incident where any of them said that Chem-Haulers or their agents had said anything to these entities, these corporations, that you sought employment. Isn't that a true statement?
A. To the best of my knowledge; yes, sir.
 Q. And you don't know, do you, that Chem-Haulers' agents, servants, or employees ever said anything to any of these corporations that you sought employment; do you?
A. According to —
 Q. Now, I'm not talking about other than what you heard through your friend, Jerry Brown; you personally do not know, do you?
A. I personally, I don't know personally.
When asked if he had any conversations with anyone from Chem-Haulers after he had attempted to locate other employment, Brown stated that he talked to Kimbrough and added:
Q. Well, what did he say?
 A. Well, I asked him, I asked him about what was going on. I asked him what was happening the reason I was getting turned down for all these jobs, that I needed a job and that's what I was interested in, and as far as attorneys was concerned, it didn't matter to me one way or the other, I was going to make a living. And he told me that if it was a job that wasn't related to a commercial vehicle that he'd help me anyway he could. But, as far as commercially, that he wouldn't ever do it because that he had a license under I.C.C., or that Chem-Haulers did, or what have you, that had to be protected, and that he wouldn't ever say one way or the other. You know, he wouldn't ever say any different.
 Q. Did you confront him about anything about your condition during the accident, about what he had talked to you about?
 A. Yeah, that's right. I told him — I told Larry, I told him, in exact words, I said, "Now, you know what kind of condition I was in when I come in. I told you what kind of condition I was." I said, "If you would just verify and tell the truth, I could get a job." But, he said he wouldn't do that or couldn't do it, or what have you.
Q. Was anything else said?
 A. Well, just other than him telling me that if it was anything besides commercial.
Brown was later reexamined on this point:
 Q. Mr. Brown, other than what you have told me Larry Kimbrough said and what you heard from your friend, Brown, have you heard from any other person at any other time, since the time you were terminated at Chem-Haulers, anything that Chem-Haulers said or was alleged to have said about you and employment? *Page 891 
A. Not that I know of.
These facts and conversations recounted by Brown fall woefully short of indicating an affirmative, intentional, malicious, unjustified or unlawful interference with any contractual right he might have had as is required in order to make the alleged interference actionable. Griese-Traylor Corp.v. First National Bank, 572 F.2d 1039 (5th Cir. 1978);Hennessey v. National Collegiate Athletic Association,564 F.2d 1136 (5th Cir. 1977); Alabama Power Co. v. Thompson, 278 Ala. 367, 178 So.2d 525 (1965). Therefore, summary judgment was properly entered as to this claim.
Brown contends the defendants' failure to verify his version of the cause of the accident constitutes slander. Even assuming that one or all of the defendants did communicate a defamatory statement to Brown's prospective employers, we are of the opinion that summary judgment was also properly entered against him on this claim.
In Berry v. City of New York Ins. Co., 210 Ala. 369,98 So. 290 (1923), it was stated:
 "Where a party makes a communication, and such communication is prompted by duty owed either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another party having a corresponding interest, the communication is privileged, if made in good faith and without actual malice. * * * The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is social or moral in its nature and defendant in good faith believes he is acting in pursuance thereof, although in fact he is mistaken."
210 Ala. at 371, 98 So. at 292. Applying these principles, even if Kimbrough actually told Brown's prospective employers that Brown's negligence was the underlying cause of the accident, such communication would appear to be at least conditionally privileged because it was a communication by a party with an interest "made to another party with a corresponding interest."Berry, supra.
In Willis v. Demopolis Nursing Home, Inc., 336 So.2d 1117
(Ala. 1976), this Court addressed the question of the appropriateness of granting summary judgment in libel actions. There the Court stated:
 This Court has recognized that disposition of the issue of actual malice by summary judgment is generally inappropriate. Loveless v. Graddick, 295 Ala. 142, 325 So.2d 137 (1975). However, where no proof of malice is offered at all, summary judgment is appropriate. Id.
Actual malice
 ". . . may be shown by evidence of previous ill will, hostility, threats, rivalry, other actions, former libels or slanders, and the like, emanating from the defendant, or by the violence of the defendant's language, the mode and extent of publication, and the like.
 Kenney v. Gurley, 208 Ala. [623] at 626, 95 So. [34] at 37.
336 So.2d at 1120.
There is nothing in the pleadings, answers to interrogatories, or Brown's deposition which raises even a scintilla as to malice. Given such circumstances, summary judgment was properly entered as to this claim.
For the foregoing reasons the judgment below is due to be affirmed.
AFFIRMED.
TORBERT, C.J., and FAULKNER, EMBRY, and ADAMS, JJ., concur. *Page 892