614 So.2d 982 (1992)
JOE COOPER & ASSOCIATES, INC., et al.
v.
CENTRAL LIFE ASSURANCE COMPANY.
1910683.
Supreme Court of Alabama.
December 18, 1992.
As Modified on Denial of Rehearing March 12, 1993.
*983 James C. Barton, David P. Whiteside, Jr. and David W. Proctor of Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, for all appellants except Larry W. Morris.
J. Michael Cooper of Tippins, Strickland & Cooper, Birmingham, for appellant Larry W. Morris.
Lewis W. Page, Jr. and Timothy A. Palmer of Lange, Simpson, Robinson & Somerville, Birmingham, for appellee.
HORNSBY, Chief Justice.
The plaintiffs filed this action against Central Life Assurance Company ("Central"), alleging breach of contract, fraud, intentional interference with business relations, tortious damage to reputation, and *984 breach of fiduciary duty. The plaintiffs are Joe Cooper & Associates, Inc., an Alabama corporation; Joe Cooper Insurance Management, Inc., an Alabama corporation ("JCIM"); Middleton/Vaughan Plans Insurance Agency, Inc., a Texas corporation; Midwest Health Systems, Inc., an Illinois corporation; William Morse Associates, Inc., a Florida corporation; Joseph A. Cooper; Marlene Middleton; Terry Vaughan; William Morse; Edwin J. Becker; James E. Fox, individually and as successor to the American Medical Administration Group, Inc. ("AMAG"); and Larry W. Morris.
Central moved for a summary judgment on all counts. The trial court entered a summary judgment for Central on all claims except the fraud claims and JCIM's breach of contract claim. JCIM alleged that Central had breached two provisions of the parties' agency agreement entered on April 1, 1986: (1) provision 2.1(b), which prohibited Central from "solicit[ing] business from brokers and agents of, or acquired by, [JCIM] during the term of [the] Agreement and ... for a period of one (1) year following termination of [the] Agreement"; and (2) provision 8.5, which required Central to compensate JCIM, even if the parties terminated the April 1, 1986, agency agreement, "so long as [JCIM] continued to perform normal marketing functions and to service in-force business" on Central's behalf.
The trial court permitted all of the plaintiffs to present to the jury evidence that Central had fraudulently induced them not to move their Policy Employers Trust ("PET") business to another insurance carrier. In addition, the trial court allowed JCIM to present evidence that Central had breached the parties' agency agreement by soliciting four of JCIM's agents. Even though Central proved that JCIM received all the commissions due for insurance written by these agents, the trial court determined that JCIM had demonstrated sufficient evidence to establish that it was entitled to nominal damages for this breach.
At the close of the plaintiffs' case, Central moved for a directed verdict. The trial court directed a verdict for Central on Larry W. Morris's fraud claim, but allowed the other plaintiffs' claims to proceed. At the conclusion of all the evidence, Central again moved for a directed verdict. The trial court directed a verdict for Central on the fraud claims asserted by Joseph A. Cooper, Marlene Middleton, Terry Vaughan, William Morse, Edwin J. Becker, and James E. Fox, individually and as successor to AMAG. The trial court denied Central's motion for a directed verdict as to the corporate plaintiffs' fraud claims and as to JCIM's breach of contract claim, and submitted those claims to the jury. The jury found for the plaintiffs, awarding a total of $1,668,328 in compensatory damages for commissions lost as a result of the termination of PET, and $2,000,000 in punitive damages. The trial court entered a judgment accordingly, but, pursuant to Central's motion for a new trial or, in the alternative, a remittitur, the trial court reduced the punitive damages award to $300,000.
The judgment based on the jury's verdict is not in issue on this appeal. Instead, all the plaintiffs, except Fox and Morris, appeal the summary judgment for Central as to their claims alleging intentional interference with business relations. All the plaintiffs, except Morris, appeal the summary judgment for Central as to their claims alleging breach of contract. (The trial court permitted JCIM to present two breach of contract questions to the jury; it appeals the summary judgment as to the other questions.) Fox appeals as to the directed verdict for Central on his fraud claim. Morris appeals the summary judgment for Central as to his claim alleging breach of fiduciary duty, and he appeals as to the directed verdict for Central on his fraud claim. We affirm the summary judgment for Central as to the breach of contract claims and Morris's breach of fiduciary duty claim. We also affirm as to Central's directed verdict on Morris's fraud claim. However, we reverse the summary judgment for Central as to the claims alleging intentional interference with business relations and remand this cause so that the plaintiffs may present to the jury evidence of intentional interference. We also reverse *985 as to Central's directed verdict on Fox's claim alleging fraud, brought in his individual capacity, and remand this cause, authorizing Fox, on remand, to present appropriate evidence as to his individual fraud claim to the trier of fact. The jury's awards and judgments with respect to all other claims are not affected by this decision.

FACTS
This dispute concerns a group health and life insurance product called "Policy Employers Trust" ("PET"). Marketing Management, Inc. ("MMI"), created PET in 1971 to "receiv[e] contributions from ... [e]mployers for [the purpose of] purchasing and maintaining [group] insurance" for their employees. Maxine Griffith and Lomax Johnson were the original trustees of PET. MMI, as settlor of PET, expressly reserved the power to remove the trustees upon 30 days' notice and to appoint successor trustees. When the events giving rise to this action occurred, AmSouth Bank was the PET trustee. Beginning in 1984, United Pacific Life Insurance Company ("UPL") provided the group insurance policy covering PET insureds.
PET prescribed that a trust administrator be authorized to determine the eligibility of employers and employees to participate in PET and to decide on the allowance of claims and payment of benefits. MMI designated its wholly owned subsidiary, M.M. Administrators, Inc. ("MMA"), as the trust administrator. The corporate plaintiffs are insurance companies whose clients were employer-members in PET. The individual plaintiffs, with the exception of Morris, are licensed insurance agents. Morris is an individual insured under PET. From 1978 to April 1, 1986, the corporate plaintiffs were agents of MMA.
On December 1, 1985, Central purchased the insurance policy on PET members from UPL and assumed the right to be the insurer for PET. On April 1, 1986, Central acquired from MMI and MMA the right to become the settlor and the trust administrator of PET. According to the plaintiffs, Central assumed the role of settlor and insurer of PET to "cherry pick" the plaintiffs' best PET clients for Central's insurance portfolio. The plaintiffs use the term "cherry picking" to mean singling out those insureds that are least likely to file health claims. The plaintiffs argue that Central acquired complete control of PET in order to gain information necessary to categorize PET members according to the health risk that each posed. The plaintiffs further argue that, after completing the categorization process, Central planned to terminate PET and obtain the low-risk PET clients for its portfolio by offering to insure them under Central's product "CLIENT."
At the same time Central acquired the right to be the settlor and the trust administrator of PET, Central entered into an agency agreement with MMA, pursuant to which MMA agreed to sell group insurance issued by Central. This agreement provided that the corporate plaintiffs would no longer be agents of MMA; instead, Central could deal directly with the corporate plaintiffs. The agreement also provided that MMA could not assign its rights and responsibilities under the agreement without prior written approval from Central.
Also on April 1, 1986, Central entered a separate agency agreement with JCIM, a corporate plaintiff. The agreement covered several details of the relationship between the plaintiffs and Central that are pertinent to this case. The agreement referred to the plaintiffs Joe Cooper & Associates, Inc.; Middleton/Vaughan Plans Insurance Agency, Inc.; Midwest Health Systems, Inc.; and William Morse Associates, Inc., as JCIM's "wholesalers." Central promised to pay commissions on employers' premiums directly to the wholesalers. JCIM promised "not to roll the bulk of PET [b]usiness" to another insurer, so long as Central offered a competitively priced product. Central granted JCIM the exclusive right to market a Central product called "GROUP CLIENT" and agreed not to solicit business from JCIM's brokers and agents during the term of the agreement and for one year following termination of the agreement. Either party could terminate *986 the relationship on 90 days' written notice. With the exception of Fox's claims, the plaintiffs' claims alleging fraud and breach of contract rested on oral promises allegedly made to Joseph A. Cooper by officers of Central during the negotiations that resulted in the April 1, 1986, agency agreement between Central and JCIM.
On November 21, 1986, MMA assigned its rights and responsibilities under its contract with Central to American Medical Administration Group, Inc. ("AMAG"). The parties agreed that the assignment would be effective from November 1, 1986. Central approved the assignment in writing on February 11, 1987. James E. Fox was president of AMAG at the time of the assignment and negotiated on AMAG's behalf. Fox's claims alleging fraud and breach of contract rested on promises allegedly made to him by officers of Central during negotiation of the November 1, 1986, assignment agreement. Additional facts pertaining to Fox's fraud claim will be discussed in connection with our analysis of his right to bring that claim.
On March 24, 1987, Central sent a letter to AmSouth, the PET trustee, notifying it that, pursuant to Central's power as settlor, it was terminating PET on June 1, 1987. On March 27, 1987, Central sent letters to participating employers notifying them of PET's termination and informing them about the insurance coverage options available to them. One option Central recommended was coverage under a Central product called "CLIENT," which the corporate plaintiffs were not authorized to sell. This recommendation is the basis for the plaintiffs' claims alleging intentional interference with business relations.

STANDARDS OF REVIEW
When reviewing a summary judgment or a directed verdict, the applicable standard of review on appeal is the same standard used by the trial court in granting or denying the motion initially. Bussey v. John Deere Co., 531 So.2d 860, 862, 863 (Ala.1988); Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). For a summary judgment, we must determine whether there was a genuine issue of material fact and, if not, whether the movant was "entitled to a judgment as a matter of law." Rule 56(c), Ala.R.Civ.P.; see Wilson, 496 So.2d at 758; Harrell v. Reynolds Metals Co., 495 So.2d 1381, 1383 (Ala.1986). For a directed verdict, we must "determine whether there was sufficient evidence to produce a conflict warranting jury consideration." Ogle v. Long, 551 So.2d 914, 915 (Ala.1989); Bussey, 531 So.2d at 863. Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant, resolving all reasonable doubts against the movant. Ogle, 551 So.2d at 915; Bussey, 531 So.2d at 863; Wilson, 496 So.2d at 758; Harrell, 495 So.2d at 1383; see also Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990); Dunklin v. Winn-Dixie of Montgomery, Inc., 595 So.2d 463, 464 (Ala. 1992).

DISCUSSION

I. Intentional Interference with Contractual or Business Relations

The plaintiffs argue that the summary judgment for Central was improper as to their claims alleging intentional interference with business relations. "The elements of a cause of action for intentional inference with contractual or business relations are as follows: (1) the existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; and (4) damage to the plaintiff as a result of the defendant's interference." Century 21 Academy Realty, Inc. v. Breland, 571 So.2d 296, 297-98 (Ala. 1990) (citing Caine v. American Life Assurance Corp., 554 So.2d 962, 964 (Ala. 1989); Gross v. Lowder Realty Better Homes & Gardens, 494 So.2d 590, 597 (Ala. 1986)). In addition, the plaintiff must show some evidence of fraud, force, or coercion, on the defendant's part. Griese-Traylor Corp. v. First National Bank of Birmingham, 572 F.2d 1039, 1045 (5th Cir.1978); Hennessey v. National Collegiate Athletic *987 Ass'n, 564 F.2d 1136, 1143 (5th Cir.1977); Volz v. Liberty Mutual Insurance Co., 498 F.2d 659, 663, reh'g denied, 503 F.2d 568 (5th Cir.1974); Brown v. Chem Haulers, Inc., 402 So.2d 887, 891 (Ala.1981); Erswell v. Ford, 208 Ala. 101, 103, 94 So. 67, 69 (1922). "Justification for the interference is an affirmative defense that must be pleaded and proved by the defendant." Breland, 571 So.2d at 298.
The plaintiffs contend that, as part of the overall scheme to "cherry pick" the plaintiffs' best clients who were members of PET, Central intentionally interfered with business relations between the plaintiffs and their PET clients by mailing two letters to the clients, informing them that PET would be terminated on June 1, 1987, and that they could apply for insurance coverage under Central's product "CLIENT." The plaintiffs, except for Fox, were not authorized to sell "CLIENT." Pursuant to the April 1, 1986, agency agreement between JCIM and Central, the plaintiffs had an exclusive right to sell "GROUP CLIENT," another of Central's products.
Central mailed the first letter referring to "CLIENT" on March 27, 1987. The plaintiffs complained to Central about its reference to "CLIENT" in this letter, and Central's director of group marketing, John T. Terry, said to JCIM, by letter dated April 10, 1987, that the reference to "CLIENT" was a mistake. Terry's letter indicated that PET members who contacted Central directly would be advised that "GROUP CLIENT," and not "CLIENT," was available to them. However, on May 15, 1987, Central sent a second letter to PET members, again informing them that they could apply for coverage under "CLIENT." It made no reference to "GROUP CLIENT." According to the plaintiffs, Central's references to "CLIENT" in these letters were the last step in a fraudulent scheme to terminate PET and steal the plaintiffs' best PET clients.
The trial court concluded that the plaintiffs' intentional interference claims were foreclosed by this Court's holding in Cahaba Seafood, Inc. v. Central Bank of the South, 567 So.2d 1304 (Ala.1990). In Cahaba Seafood we held that a claim alleging intentional interference was not available when a party to the contract allegedly breached the contract and affected the relationship between the nonbreaching party and a third party. Id. at 1306. The plaintiffs alleged that Central intentionally interfered with the business relations between the plaintiffs and their PET clients, not the contract between JCIM and Central. Consequently, our holding in Cahaba Seafood does not apply to the facts of this case. The first element of the plaintiffs' claim is satisfied by the existence of business relations between the plaintiffs and their PET clients, not by JCIM's contract with Central.
Turning to the remaining elements in the plaintiffs' claim of intentional interference, Central does not dispute the fact that it had knowledge of the relationship between the plaintiffs and their PET clients. Central does argue that its references to "CLIENT" were mistakes, not intentional acts of interference. We conclude, however, that because the plaintiffs proved that Central's letter of May 15, 1987, was identical to its first letter of March 27, 1987, the plaintiffs have created a genuine issue as to whether Central's interference was intentional.
Central also argues that the plaintiffs cannot show any damage resulting from Central's references to "CLIENT." In support of its motion for summary judgment, Central presented evidence that none of the plaintiffs' PET clients purchased "CLIENT." In rebuttal, the plaintiffs state that they can identify PET clients who stopped doing business with them as a result of Central's letters dated March 27, 1987, and May 15, 1987. We, therefore, conclude that the plaintiffs have presented substantial evidence creating an issue as to whether they suffered damage as a result of Central's references to "CLIENT."
Finally, Central argues that, even if the plaintiffs have established a prima facie case of intentional interference, they cannot prevail because, Central says, it was *988 merely competing with the plaintiffs to satisfy the future insurance needs of PET members. Although Central correctly asserts that competition is a justification for interference, this case is distinguishable from those cases in which insurance companies have terminated their relationships with insurance agents, solicited business from the agents' clients, and successfully defended the agents' actions alleging intentional interference by relying upon competition for business as a justification for interference. See Cutter v. Lincoln National Life Insurance Co., 794 F.2d 352 (8th Cir. 1986); Caine v. American Life Assurance Corp., 554 So.2d 962 (Ala.1989); Travelers Indemnity Co. v. Merling, 326 Md. 329, 605 A.2d 83 (1992), cert. denied, ___ U.S. ___, 113 S.Ct. 465, 121 L.Ed.2d 373 (1992). In those cases the agents' relationships with their clients were not independent of their agency relationships with the insurance companies, and the agents' rights to satisfy their clients' insurance needs were not exclusive.
In this case, the plaintiffs' relationships with their PET clients existed before Central ever became involved with PET; thus, a jury could determine that the plaintiffs' relationships with their PET clients were independent of the agency relationships between the plaintiffs and Central and were independent of the insurer/insured relationships between Central and PET members. Additionally, the April 1, 1986, agency agreement between the plaintiffs and Central stated that Central would not "solicit business from brokers and agents of, or acquired by, [JCIM] during the term of [the] Agreement and ... for a period of one (1) year following termination of [the] Agreement." A jury could find that this provision gave the plaintiffs the exclusive right, vis-a-vis Central, to satisfy their clients' insurance needs. Accordingly, a jury should consider whether Central's references to "CLIENT" were justifiable competition for business. As to this issue, we reverse the judgment for Central and remand this cause.
However, we point out that, because the corporate plaintiffs have already recovered compensatory damages for commissions lost as a result of the termination of PET, on remand the trial court should instruct the jury that, should it decide that the plaintiffs are entitled to some compensation for Central's acts of intentional interference, its award should not include compensation for commissions lost as a result of PET's termination.
However, we direct the trial court that on remand it should instruct the jury that, should it decide that the plaintiffs are entitled to some compensation for Central's acts of intentional interference, then the jury's award should not include compensation for commissions lost as a result of PET's termination. The reason for this instruction is that the corporate plaintiffs were compensated for lost commissions in the compensatory damages portion of the $1.9 million fraud judgment, which Central has satisfied. Although Central contends that the compensatory damages portion of the $1.9 million fraud judgment compensated the corporate plaintiffs for losses other than the commissions lost as a result of PET's termination, we know that these lost commissions constituted the only loss for which the jury awarded compensation, because the compensatory damages award precisely equalled the plaintiffs' estimate, in their exhibit 27, of commissions lost as a result of PET's termination.

II. Breach of Contract

The plaintiffs also argue that the summary judgment for Central was improper as to the plaintiffs' claims alleging breach of contract. The plaintiffs alleged that Central was obligated by contract to give the plaintiffs adequate time to find another insurance carrier if Central decided to terminate PET. In support of this claim, the plaintiffs offered an affidavit from Cooper stating that, during the negotiations that produced the April 1, 1986, agency agreement between JCIM and Central, Central's officers induced him to promise not to move the bulk of PET business by stating that Central "had no intention of terminating the PET trust" and that "if it should decide to close the PET block, it would give [the plaintiffs] adequate time to find another carrier for [their] clients." At the time, *989 Cooper was negotiating as an authorized agent for all the plaintiffs except Fox. Fox alleged that Central's officers made the same promises to him during negotiations that resulted in AMAG's assumption of MMA's contract with Central on November 1, 1986.
Neither the April 1, 1986, agency agreement between JCIM and Central, nor AMAG's assignment agreement, dated November 11, 1986, contained a provision obligating Central to give the plaintiffs notice if Central terminated PET. The only provision pertaining to notice of termination was contained in PET. This provision required Central to give insureds 60 days' written notice of termination. The evidence reveals that the plaintiffs received more than 60 days' notice that PET would be terminated on June 1, 1987; however, the plaintiffs argue that this was not "adequate time" to find another insurance carrier.
The plaintiffs advanced two theories that they said would entitle them to recover damages on their breach of contract claims. First, they argued that Central's oral statements constituted evidence of an oral contract between the plaintiffs and Central. The trial court rejected this argument, holding that the oral statements were merely statements of opinion or intention, not binding as promises. We agree. Under general contract principles, "[a] mere expression of intention or general willingness to do something on the happening of a particular event does not amount to an offer." Dillon v. AFBIC Development Corp., 420 F.Supp. 572 (S.D.Ala. 1976), aff'd in part, rev'd in part, 597 F.2d 556 (5th Cir.1979); see Restatement (Second) of Contracts § 2 comment e (1981). The plaintiffs' evidence did not establish that Central's oral statements were anything more than statements of opinion or intention, insufficient as a matter of law to form a contract.
Alternatively, the plaintiffs argued that Central's oral statements constituted a modification to PET's termination provisions that required Central to give 60 days' notice of termination to the insureds. "To be effective as a modification, the new agreement must possess all the elements necessary to form a contract." 17A Am. Jur.2d Contracts § 520 (1991); see Chicago College of Osteopathic Medicine v. George A. Fuller Co., 776 F.2d 198, 208 (7th Cir. 1985); Caffrey Farms, Inc. v. Williams Pipe Line Co., 739 F.2d 1366, 1368 (8th Cir.1984); Nyhus v. Travel Management Corp., 466 F.2d 440, 445 (D.C.Cir.1972). Therefore, the plaintiffs' modification argument also fails, because Central's oral assertions were merely statements of opinion or intention, not promises. Accordingly, we affirm the judgment for Central as to the plaintiffs' breach of contract claims.

III. James E. Fox's Fraud Claim

Fox argues that the trial court improperly directed a verdict for Central on his fraud claim. Fox was serving as president and chief executive officer of AMAG when, on its behalf, he negotiated an agency relationship between AMAG and Central. The creation of this relationship was a two-step process: (1) AMAG and MMA entered an assignment agreement effective November 1, 1986, whereby AMAG acquired MMA's rights and responsibilities under MMA's agency agreement with Central, dated April 1, 1986; and (2) Central approved MMA's assignment to AMAG on February 11, 1987. Pursuant to the terms of MMA's April 1, 1986, agency agreement with Central, MMA could not assign its rights and responsibilities under the parties' agreement without Central's approval.
Fox contends that Central defrauded him and AMAG by failing to disclose a plan to terminate PET, which Fox says Central formulated at the time it acquired PET. According to Fox's fraud theory, Central pursued an agency relationship with AMAG to gain access to information about AMAG's clients who were members of PET and to categorize them according to risk; then, upon PET's termination, Central could obtain the best clients for Central's insurance products. Specifically, Fox alleged that, during the negotiation of the November 1, 1986, assignment agreement, he was concerned that Central's position, as both the settlor and the insurer of PET, *990 gave it significant control over PET. According to Fox, this concern prompted him to ask Central's officers whether Central planned to terminate PET. Fox stated in his deposition that, in response to his question, Central's officers told Fox "that there were no plans to terminate [PET;]" and that Fox "shouldn't worry about [whether Central intended to terminate PET], that if the decision was made to terminate [PET], [Central] would give ... [Fox] adequate notice and would cooperate with [him] in trying to find another carrier." At least one Central officer did not deny making these statements to Fox. Fox argues that the representations made by Central's officers were false and were calculated to induce him to acquire MMA's rights and responsibilities under its April 1, 1986, agency agreement with Central.
The record reveals that on February 8, 1987, three days before Central accepted MMA's assignment to AMAG, Central's marketing department decided to terminate PET. Central officially terminated PET by a letter, dated March 24, 1987, to AmSouth, the PET trustee. Subsequent to PET's termination, AMAG assigned all its rights under its November 1, 1986, assignment agreement with Central to C.C. Systems, Inc., in an assignment agreement dated June 4, 1987. AMAG filed for bankruptcy. On July 7, 1987, C.C. Systems assigned all its rights under the Central agreement to Fox individually.
Fox brought this fraud action against Central, both as successor in interest to AMAG and in his individual capacity. At the close of all the evidence, the trial court directed a verdict for Central on all the individual plaintiffs' fraud claims, including Fox's, but submitted the corporate plaintiffs' fraud claims to the jury. AMAG never properly entered this action as a corporate plaintiff. Fox is the only individual plaintiff that appealed in regard to his individual action alleging fraud. We infer from the record below that the trial court directed a verdict against Fox on two grounds: first, Fox was not entitled to bring a fraud action as AMAG's successor in interest, because AMAG could not validly assign its fraud claim to Fox; and, second, Fox did not produce sufficient evidence on his individual fraud claim to create a conflict warranting the jury's consideration.
The trial court properly concluded that AMAG could not validly assign its fraud claim to Fox. The validity of an assignment is governed by the law of the place where the assignment took place. Fourth National Bank of Montgomery v. Woolfolk, 220 Ala. 344, 125 So. 217 (1929); New York Life Insurance Co. v. Scheuer, 198 Ala. 47, 73 So. 409, 412 (1916). Both assignments took place in Kansas. Although the Kansas Supreme Court has recognized exceptions to the common law rule that tort claims are not assignable (see Glenn v. Fleming, 247 Kan. 296, 314, 799 P.2d 79, 90-91 (1990), overruling in part Heinson v. Porter, 244 Kan. 667, 675, 772 P.2d 778, 785 (1989)), we infer from Heinson and Glenn that a fraud claim is not assignable in Kansas. Therefore, assuming that AMAG attempted to assign its fraud claim to C.C. Systems, and C.C. Systems to Fox, these assignments would not be valid.
Because we have determined that Fox could not maintain a fraud action as a successor in interest to AMAG, the question that remains is whether the trial court should have submitted Fox's individual fraud claim to the jury. Fox argues that he is entitled to maintain a fraud action against Central in his individual capacity, because Central's officer assured him personally, even though he was acting on AMAG's behalf, that Central did not plan to terminate PET and that, if it decided to terminate PET, it would give Fox adequate notice of termination and work with him to find another carrier.
In order to determine whether Fox should be entitled to submit his individual fraud claim to the jury, we must review the sufficiency of his fraud evidence. The law to be applied in fraud cases is set forth in Ala.Code 1975, §§ 6-5-101, -102, and -103:
"Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted upon by *991 the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."
Ala.Code 1975, § 6-5-101.
"Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."
Ala.Code 1975, § 6-5-102.
"Willful misrepresentation of a material fact made to induce another to act, and upon which he does act to his injury, will give a right of action. Mere concealment of such a fact, unless done in such a manner as to deceive and mislead, will not support an action. In all cases of deceit, knowledge of a falsehood constitutes an essential element. A fraudulent or reckless representation of facts as true, which the party may not know to be false, if intended to deceive, is equivalent to a knowledge of the falsehood."
Ala.Code 1975, § 6-5-103.
This Court held in Hudson v. Moore, 239 Ala. 130, 134, 194 So. 147, 150 (1940), "`[T]he statement of an opinion which is not [a truthful] opinion, made to deceive and which does deceive, may, by reason of [the] peculiar knowledge of facts [possessed by the party giving the opinion] upon which a reliable opinion may be based and [which are] not accessible to the other party, amount[s] to deceit.'" (Citations omitted.) (Quoting Cartwright v. Braly, 218 Ala. 49, 52, 117 So. 477, 480 (1928)); see Scholz Homes, Inc. v. Hooper, 287 Ala. 628, 254 So.2d 328 (1971); Shepherd v. Kendrick, 236 Ala. 289, 181 So. 782 (1938). "The mere form of the representation as one of opinion or fact is not in itself conclusive, and in cases of doubt the question should be left to the jury." Fidelity & Cas. Co. v. J.D. Pittman Tractor Co. 244 Ala. 354, 358, 13 So.2d 669, 672 (1943).
Fox stated in his deposition that he specifically inquired about Central's intent with respect to the termination of PET and that Central's officers represented that Central had no intention of terminating PET, but that Central would notify Fox if it later decided to terminate PET. From this evidence a jury could find that Central's officers misrepresented material facts regarding Central's intention, or lack of intention, to terminate PET. The jury could also find that Central owed AMAG and Fox a duty to disclose any decision to terminate PET, and that, by failing to disclose its February 8, 1987, decision to terminate PET before approving MMA's assignment to AMAG, on February 11, 1987, Central fraudulently induced AMAG to enter an agency agreement with Central in order to gain access to information about AMAG's clients and, following PET's termination, solicit only AMAG's best clients for Central's portfolio.
Because Fox was negotiating on AMAG's behalf when Central's officer allegedly made false representations to Fox, Fox's ability to sue Central in his individual capacity is governed by agency law. Under the Restatement (Second) of Agency § 374(2) (1957), an agent cannot bring an action in his own name for a tort by a third party against the principal, unless the third party's actions were intended "for the purpose of harming the agent's interests." Restatement (Second) of Agency § 374(2) (1957). In Steiner Bros. v. Clisby, 103 Ala. 181, 15 So. 612 (1894), this Court stated that an agent can maintain a fraud action against a third party to recover for injuries suffered while transacting business for his principal if the third party intended that the agent act on the fraudulent representations "`in a manner affecting'" the agent. Clisby, 103 Ala. at 192, 15 So. at 615 (quoting Wells v. Cook, 16 Ohio St. 67, 88 Am.Dec. 436 (1865)). The question of whether the third party intended for his conduct to harm the agent personally is a question for the jury to resolve.
Fox presented the following evidence to prove that Central's officers intended for their allegedly fraudulent representations to harm Fox in his individual capacity: Fox was president, chief executive officer, and chief stockholder of AMAG when he negotiated with Central *992 and MMA on AMAG's behalf, and, pursuant to an agreement between Central, MMA, and AMAG, dated November 1, 1986, and accepted by Central on February 11, 1987, Fox received PET commission payments directly from Central and assigned those payments to AMAG. Fox, further, alleges that he lost his position with AMAG and his commission payments as a result of PET's termination. We find this evidence sufficient to establish a question as to whether Central intended to harm Fox personally and whether Fox sustained personal damage as a result of the alleged fraud.
Fox presented evidence that Central's officers specifically represented to him that Central would notify him if it decided to terminate PET. Fox has also shown that Central approved MMA's assignment to AMAG on February 11, 1987, without telling Fox about the February 8, 1987, decision to terminate PET, and that, as a result of PET's termination, Fox lost his commissions. From this evidence a jury could find that Central intended, from the outset, to terminate PET and to conceal its intention in furtherance of a scheme to "cherry pick" from among AMAG's clients, and, further, that Central's acts of concealment harmed Fox individually. It follows that the trial court should have submitted Fox's individual fraud claim to the jury. The judgment is therefore reversed as to the directed verdict for Central on Fox's individual fraud action, and the cause is remanded for a trial on the issue of fraud as to Fox individually. This decision does not grant Fox the right to litigate AMAG's fraud claim against Central.

IV. Larry W. Morris's Claims

Morris argues that the summary judgment for Central was improper as to his claim alleging breach of fiduciary duty. He also argues that the trial court improperly directed a verdict for Central on his fraud claim. With respect to both claims, Central argues that Morris lacks standing to bring an action against Central because he was not eligible to participate in PET. PET established two classes of persons eligible to participate: "(1) permanent full-time employees who work 30 hours or more per week; (2) active full-time partners, proprietors, or officers of your firm also working 30 hours or more per week."
Morris became a PET insured while he was a partner in Morris Excavating Company, an employer-member of PET. Morris sold his interest in Morris Excavating Company in 1985. In order to continue coverage under PET for himself, his wife, and his children, he submitted an application for insurance to JCIM under the name of "Morris & Associates." The application stated that Morris & Associates was a company in the business of selling swimming pools. However, in his deposition, Morris admitted that Morris & Associates never did any business. Consequently, we conclude that Morris presented no evidence that he satisfied PET's eligibility requirements.
In response to Central's assertion that Morris lacks standing, Morris argues that Central waived its right to deny him coverage under PET. The gist of Morris's argument is that Central received constructive notice that Morris was not eligible to participate in PET because Morris wrote his monthly premium payments on his personal checking account, not on a business account; therefore, by accepting Morris's premium payments, Morris says, Central waived PET's eligibility requirements as to Morris. We find the fact that Morris paid monthly premium payments from his personal checking account insufficient, as a matter of law, to place Central on notice that Morris was not eligible to participate in PET. See McGee v. Guardian Life Insurance Co., 472 So.2d 993 (Ala.1985); Home Indemnity Co. v. Reed Equipment Co., 381 So.2d 45 (Ala.1980).
The coverage provisions of PET are clear. Because Morris presented no evidence that he was eligible to participate in PET, he lacks standing to bring an action against Central. Therefore, we affirm the judgment for Central as to Morris's claim alleging breach of fiduciary duty and as to Morris's fraud claim.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
*993 SHORES, ADAMS, HOUSTON, STEAGALL and KENNEDY, JJ., concur.
MADDOX, J., concurs in the result in part and dissents in part.
MADDOX, Justice (concurring in the result as to Parts I, II, and IV of the majority opinion; and dissenting as to Part III).
I concur in the result as to Parts I, II, and IV of the majority opinion, but I must dissent from the majority's reversal of that portion of the judgment based on the directed verdict against James E. Fox on his individual fraud claim.
The majority relies on Restatement (Second) of Agency § 374(2) (1957) and Steiner Brothers v. Clisby, 103 Ala. 181, 15 So. 612 (1894), in allowing Fox to sue Central for a fraud allegedly perpetrated on AMAG, Fox's principal. Although, technically, the majority states the pertinent law relating to an agent's action on a tort committed against his principal, a close reading of those authorities, and a review of the evidence Fox presented at trial, convinces me that a directed verdict was appropriate in this case.
Restatement (Second) of Agency § 374(2) (1957) states:
"A servant or other agent has no action of tort because another has tortiously harmed the principal or destroyed his business, unless the other acted for the purpose of harming the agent's interest."
(Emphasis supplied.)
Further, comment b to § 374(2) states:
"In conformity with the normal tort rule, a servant who loses his job or otherwise suffers economic loss as a result of the principal's misfortune, tortiously caused by another, has not thereby an action against the other. If, however, the other destroys the master's business in order to cause loss to the servant, the latter has a cause of action."
(Emphasis supplied.)
My research reveals that Steiner Brothers v. Clisby, 103 Ala. 181, 15 So. 612 (1894), cited by the majority, is the only Alabama case directly discussing a suit by an agent in his personal capacity for a fraud perpetrated on his principal. In Clisby, this Court stated:
"In the application of the foregoing principle, however, it is not enough to show that the defendant has money he can not conscientiously retain, but the plaintiff must go further and show, that of right he is entitled to it. It will be observed, that in all the authorities referred to, the party defrauded, the one whose money had been obtained and was withheld by the defendant, was the party to maintain the action. In the extract from Greenleaf, it was `the money of the plaintiff,' and in the one from Starkie, it was the `money belonging to the plaintiff,' that was referred to as being recoverable by him, and so it was, in the cases citedthe obligation, in each instance, being on the defendant to refund to the plaintiff his money, and not another's. If the false representation is made to A to induce him to part with his money, and he does so, A must sue; but, if made to him to induce B to part with his, and B is induced thereby to do so, he, and not A, is the party injured, who may maintain the action.

"In Wells v. Cook, 16 Ohio St. 67, s. c. 88 Am.Dec. 436, it was held, that the one who has been damaged by acting on false and fraudulent representations made to him as agent of another, but not intended to be acted on by him, has no action for deceit against the party making the representations. The court in that case [said]: `We are satisfied that one of the prescribed limits is this: that the false and fraudulent representations must have been intended to be acted on, in a manner affecting himself, by the party who seeks redress for the consequential injuries.'"

103 Ala. at 192, 15 So. at 614-15 (emphasis supplied).
The clear requirement of both Clisby and the Restatement (Second) § 374(2) and comment b thereto, in my opinion, is that the agent must prove that the third party (the defendant) intended that the agent act on the false and fraudulent representation *994 in a manner affecting the agent personally. Stated differently, to avoid a directed verdict against his claim, the agent must offer substantial evidence[1] that the third party (the defendant) intended to harm him personally, and not merely to harm him by harming his principal. My personal review of the evidence convinces me that Fox did not offer substantial evidence of this element of his cause of action.
The majority states:
"Fox presented evidence that Central's officers specifically represented to him that Central would notify him if it decided to terminate PET. Fox has also shown that Central approved MMA's assignment to AMAG on February 11, 1987, without telling Fox about the February 8, 1987, decision to terminate PET, and that, as a result of PET's termination, Fox lost his commissions. From this evidence a jury could find that Central intended, from the outset, to terminate PET and to conceal its intention in furtherance of a scheme to `cherry pick' from among AMAG's clients, and, further, that Central's acts of concealment harmed Fox individually. It follows that the trial court should have submitted Fox's individual fraud claim to the jury."
At 992 (emphasis supplied).
Assuming, without conceding, the correctness of the emphasized statement from the majority opinion, this does not mean that Fox offered substantial evidence that Central intended to harm him personally. That is, assuming that Central intended to terminate PET and to conceal this intention from AMAG (i.e., to harm AMAG), and assuming that this concealment harmed Fox, this does not establish that Central intended to harm Fox personally. I have reviewed the evidence in this case and conclude that Fox presented nothing tending to establish that Central intended to harm him personally and not merely to harm him incidentally because of harm done to AMAG. Accordingly, I would affirm as to the directed verdict against Fox on his individual fraud claim.
NOTES
[1] A motion for directed verdict is a procedural device by which one party tests the sufficiency of the other party's evidence. See, Rule 50(a), Ala.R.Civ.P.; Alabama Power Co. v. Williams, 570 So.2d 589 (Ala.1990); John R. Crowley & Bros., Inc. v. Brown, 569 So.2d 375 (Ala.1990). The ultimate question, of course, on a motion for directed verdict is whether the nonmovant has presented sufficient evidence to allow submission of the case or issue to the jury for a factual resolution. J. Hoffman & S. Guin, Alabama Civil Procedure § 8.37 (1990). For actions filed after June 11, 1987, the standard of review applicable to motions for directed verdict is the "substantial evidence rule." See, § 12-21-12(a), Ala.Code 1975; Koch v. State Farm Fire & Cas. Co., 565 So.2d 226, 228 (Ala. 1990). Thus, in an action filed after June 11, 1987, a nonmovant must present "substantial evidence" supporting each element of his cause of action or defense in order to withstand a motion for a directed verdict. "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); see Ala.Code 1975, § 12-21-12.