(122 P.3d 365)
No. 91,11█

MARIA ORTIZ, *Appellee*, v. JOHN P. BISCANIN, PUBLIC ADMINISTRATOR OF THE ESTATE OF THEODORO HERNANDEZ, DECEASED, *Appellee*, v. GUARANTY NATIONAL INS. CO., *Appellant*.

Opinion filed December 3, 2004.

*J. Franklin Hummer*, of Shawnee Mission, for appellant.

*Christopher P. Sweeny* and *John E. Turner*, of Turner & Sweeny, of Kansas City, Missouri, for appellee Maria Ortiz.

*Donald W. Vasos*, of Vasos Law Offices, of Fairway, for appellee John Biscanin, Administrator of the Estate of Theodoro Hernandez.

Before GREEN, P.J., MCANANY, J., and BUKATY, S.J.

MCANANY, J.: Guaranty National Insurance Company (Guaranty) appeals from the district court's entry of judgment in a garnishment proceeding and its award of attorney fees. We affirm.

This extensive litigation centers on Guaranty's issuance of an auto insurance policy to Sandra Simental. The policy provided liability coverage of $25,000. The insured automobile was involved in an accident in Colorado while being driven by Simental's boyfriend, Theodoro Hernandez. Hernandez and his passenger, Gilberto Ortiz, died in the accident. Dustin Glenn, the driver of the other automobile, also died in the accident. Hernandez' fault is not in question. His vehicle crossed the center line of the highway and struck the Glenn vehicle. Hernandez had a blood-alcohol level of .546 at the time of the accident. Guaranty took the position that Simental lied in answering five questions on the insurance application form. Simental's native tongue is Spanish. Her ability to speak in English is extremely limited. Simental claimed these five questions were never put to her, but rather were answered by the agent selling the policy without input from her.

The procedural history of the litigation can be summarized as follows:

5/24/97 The accident occurs in Colorado. Hernandez and passenger Ortiz are killed. Glenn, the driver of other car, is also killed.

6/9/97 Glenn's estate and a representative of the Ortiz family contact Guaranty about coverage for the deaths. National Farmers Union Property and Casualty Companies (Farmers Union) (the uninsured motorist insurer for the Glenn family) also inquires of Guaranty about coverage.

6/10/97 Guaranty assigns the claim from Glenn's family to Ward North America (Ward), a private adjustment firm, for an investigation of the facts relating to policy coverage.

6/13/97 Ward sends a letter to the attorney for Glenn's family stating, "there are coverage questions." That same day, Ward sends a report to Guaranty saying rescission of the Simental policy is possible.

7/1/97 Ward sends Simental a letter warning that if she fails to cooperate with Guaranty, she could jeopardize her liability coverage under the Guaranty policy. (Ward does not warn Simental, Guaranty's insured, of the policy problems communicated earlier to the attorney for Glenn's family who are prospective claimants.)

7/15/97 Ward reports to Guaranty and recommends rescission of the policy.

7/16/97 Guaranty hires attorney Donald Lysaught to help make a decision about rescission.

7/31/97 Lysaught takes a sworn statement from Simental. Simental denies that agent Barnes asked the five questions when the application was taken. Simental is not warned about Guaranty's concerns about coverage.

8/6/97 Guaranty files a declaratory judgment action seeking to avoid coverage under the policy. Guaranty does not open an estate for Hernandez. Hernandez is not joined in the suit. Ortiz is not joined in the suit. The heirs of Glenn are not joined. (Farmers Union later settled an uninsured motorist claim for Glenn's death, but Guaranty did not

then join Farmers Union in the suit when Farmers Union's subrogation claim matured.)

8/11/97 Guaranty sends rescission letter to Simental.

8/19/97 Ortiz offers to settle with the Hernandez estate for Guaranty's $25,000 policy limits. Guaranty rejects the settlement offer.

2/3/98 John P. Biscanin, public administrator, opens an estate for Hernandez and thereafter obtains letters of administration.

3/20/98 Maria Ortiz sues Biscanin, administrator of the Hernandez estate, for the wrongful death of her husband. Attorney Vasos defends Biscanin. He does not tender the defense to Guaranty, taking the position that since Guaranty has rescinded the policy, the Hernandez estate owes no duty to cooperate further with Guaranty.

4/23/98 Attorney Lysaught writes to Guaranty and reports that the Ortiz case presents a case of either no coverage or full policy limits exposure. This same day, Guaranty moves to consolidate the Ortiz wrongful death action with the declaratory judgment action.

4/24/98 Guaranty, without first moving to intervene, purports to enter an appearance in the *Ortiz v. Biscanin* case and moves to stay proceedings until the declaratory judgment case is resolved.

5/29/98 The court denies Guaranty's motion to stay proceedings in *Ortiz v. Biscanin* because Guaranty lacks standing in the suit.

6/1/98 Lysaught warns Guaranty that there is a risk of a claim of bad faith and a judgment in excess of the policy's $25,000 coverage limit. He notes that the case is a swearing match between Barnes and Simental.

6/30/98 The court grants Guaranty's motion to consolidate the declaratory judgment action and the Ortiz wrongful death action.

7/3/98 Guaranty obtains for the first time a statement from Felicia Ortega, the witness Barnes and Simental claim was present when Simental applied for the Guaranty policy.

7/28/98  Two-day trial of the declaratory judgment action.

11/13/98  Mrs. Ortiz makes a settlement demand to Biscanin for $618,548.67. Ortiz was age 21 at time of his death. Mrs. Ortiz claimed damages in the form of discounted future earnings of $368,548.67 plus noneconomic damages of $250,000. Attorney Vasos recommends to client Biscanin a settlement offer of $500,000.

4/13/00  The court's journal entry of judgment is filed in the declaratory judgment action. The court finds that (1) Guaranty failed to prove Simental acted fraudulently, and (2) Guaranty is estopped to deny coverage. Later, the court grants Simental's motion for fees. Guaranty appeals.

5/10/00  Consistent with his attorney's recommendation, Biscanin offers to settle with Mrs. Ortiz for $500,000. Mrs. Ortiz accepts the offer.

5/16/00  A hearing is held on the settlement of the Ortiz wrongful death case. Guaranty's counsel is present for the hearing. Biscanin agrees to settle with Mrs. Ortiz for $500,000 in exchange for a covenant not to execute on the personal assets of the Hernandez estate. Biscanin and Mrs. Ortiz testify. The court finds the settlement is fair, just, and equitable.

5/17/00  The court enters judgment of $500,000 in favor of Mrs. Ortiz and against the Hernandez estate.

6/12/00  Guaranty files a notice of its appeal of the $500,000 judgment against the Hernandez estate. One month later, Guaranty withdraws this appeal.

6/1/01  The Court of Appeals affirms the trial court's judgment in the declaratory judgment action. Following this decision, Guaranty pays into court its policy limit of $25,000.

7/17/01  Guaranty is served with a garnishment in the Ortiz wrongful death action.

8/22/01  Guaranty removes the garnishment to federal court. The federal district court later remands the case to state court. Guaranty fails to file an answer to the garnishment.

8/5/02  The district court holds a 4-day trial on the garnishment. Before trial, Guaranty moves in limine to exclude evi-

dence of events after 8/11/97 (the date it sent its rescission letter to Simental). The district court overrules the motion. On the second day of trial, Guaranty files an untimely answer to the garnishment without seeking leave of court to do so. Attorney Edward Boyle testifies that the settlement was reasonable and based on commonly accepted methods of evaluating claims.

5/20/03 The court announces its decision in the garnishment action. The court finds that (1) Guaranty's denial of coverage was in bad faith; (2) its failure to settle was negligent and in bad faith; (3) the Ortiz/Biscanin settlement was reasonable and free of collusion; (4) the settlement and resulting judgment were caused by the acts of Guaranty; and (5) Guaranty's acts of bad faith occurred before 8/11/97. The court specifically finds that Guaranty did not file an answer to the garnishment, as required by K.S.A. 60-718. However, in view of the other findings and conclusions, the court determines that it need not rule further on Guaranty's failure to file a timely answer, and does not premise its rulings on Guaranty's apparent default. The court enters judgment against Guaranty on the garnishment for $475,000. Thereafter Guaranty moves for a new trial.

7/11/03 Guaranty's motion for a new trial is overruled. The court finds that since Guaranty failed to pay without just cause or excuse, it is liable for fees of $158,333.33 to be split between Biscanin's and Ortiz' lawyers. This appeal follows.

## Form of Guaranty's Appellate Brief

Both Ortiz and Biscanin argue that Guaranty's statement of facts set forth in its appellate brief should be stricken for failure to comply with Supreme Court Rule 6.02 (2003 Kan. Ct. R. Annot. 35). In view of this court's October 4, 2004, ruling on Guaranty's Motion to Determine Sufficiency of Compliance with Rule 6.02 Prior to Oral Arguments, this issue is moot. We note, however, that pur-

suant to Rule 6.02(d) we consider those purported facts not keyed to the record to be unsupported by the record on appeal.

## Guaranty's Default in the Garnishment

Ortiz claims that this court need not review the trial court's ruling on negligence and bad faith since Guaranty did not timely file a verified answer and, therefore, was in default and waived its defenses. This ignores the district court's ruling that its determination of negligence and bad faith was independent of Guaranty's failure to file a timely answer. We will, therefore, consider the district court's rulings on the issue.

## Relevant Time Period for Considering the Issue of Negligence and Bad Faith

Guaranty claims that the district court improperly considered evidence regarding Guaranty's negligence and bad faith that occurred after it filed the declaratory judgment action. The admission of evidence lies within the sound discretion of the trial court. *Wendt v. University of Kansas Med. Center,* 274 Kan. 966, 975, 59 P.3d 325 (2002). Guaranty must establish an abuse of discretion regarding the evidentiary rulings it criticizes. To prevail on these matters, it must establish that no reasonable person would take the view adopted by the district court. *Jenkins v. T.S.I. Holdings, Inc.,* 268 Kan. 623, 633-34, 1 P.3d 891 (2000); see *First Savings Bank, F.S.B. v. Frey,* 29 Kan. App. 2d 436, 440, 27 P.3d 934 (2001).

Ortiz and Biscanin argue that Guaranty's criticism is disingenuous, since Guaranty introduced into evidence its entire claim file containing many documents that post-dated the filing of the declaratory judgment case. Nevertheless, in its findings of fact and conclusions of law, the district court stated:

"Ultimately, determination of the relevant date is not necessary because it will not change the outcome of this case. For the reasons set forth below, the Court finds [Guaranty]'s acts and conduct on and before August 6, 1997, support the finding of negligence and bad faith. Moreover, the actions of [Guaranty] after the filing of the declaratory judgment action also demonstrate continuing negligence and bad faith."

Since the district court predicated its finding of negligence and bad faith on actions and events on and before August 6, 1997, we look

to those actions and events to determine the soundness of the district court's judgment. In doing so, we are mindful that some actions and events after August 6, 1997, bear on the issue of Guaranty's claimed pre-August 6, 1997, negligence or bad faith. We consider those actions and events to the extent that they demonstrate Guaranty's negligence or its good faith or lack thereof before it filed its declaratory judgment action.

*Standard of Review*

Our task is to examine the record to determine whether substantial evidence supports the trial court's findings and conclusions. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion. *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. 313, 318, 64 P.3d 372 (2003). " 'The court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact.' [Citation omitted.]" *State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas*, 275 Kan. 763, 775, 69 P.3d 1087 (2003). We accept as true all evidence and inferences supporting the district court's findings and disregard any contrary evidence or inferences. *Garvey Elevators, Inc. v. Kansas Human Rights Comm'n*, 265 Kan. 484, 497, 961 P.2d 696 (1998). We will not set aside findings of fact unless they are clearly erroneous. K.S.A. 2003 Supp. 60-252(a). On the other hand, our review of conclusions of law is unlimited. *Nicholas v. Nicholas*, 277 Kan. 171, 177, 83 P.3d 214 (2004).

Guaranty requests we ignore these well-established principles and review the record de novo. Guaranty first argues for application of the de novo review standard based upon its contention that the trial court violated the spirit and intent of K.S.A. 2003 Supp. 60-252 when it adopted *in toto* the suggested findings of fact and conclusions of law submitted by Biscanin and failed to make its own independent findings and conclusions. We fail to see how such conduct, if improper, leads to the conclusion that this court must, therefore, review the record de novo. Nevertheless, we will examine Guaranty's argument.

K.S.A. 2003 Supp. 60-252 states, in relevant part, that in all actions tried upon facts without a jury, "the judge shall find, and either orally or in writing state, the controlling facts." Additionally Supreme Court Rule 165 (2003 Kan. Ct. R. Annot. 202) states that when matters are submitted to a judge without a jury, "the judge shall state the controlling facts required by K.S.A. 60-252, and the legal principles controlling the decision."

Guaranty cites *Roberts v. Ross*, 344 F.2d 747, 751-52 (3d Cir. 1965), in which the court announced its disapproval of the trial court adopting the findings proposed by a party. *Roberts* is no longer good law. In *Lansford-Coaldale Joint Water Authority v. Tonolli Corp.*, 4 F.3d 1209, 1215 n.5 (3d Cir. 1993), the court stated that *Roberts* had been superseded by *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 84 L. Ed. 2d 518, 105 S. Ct. 1504 (1985), and its decision in *Hayes v. Community General Osteopathic Hosp.*, 940 F.2d 54, 57 (3d Cir. 1991). In *Hayes*, the court explained the *Anderson* decision when it stated:

> "*Anderson* held that 'even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed *only if clearly erroneous.*' 470 U.S. at 572, 105 S. Ct. at 1511 (emphasis added). 'A district court's verbatim adoption of findings proposed by one party is not, of itself, error . . . [O]ur review is only to determine whether the findings are supported by the evidence of record. If they are, then their source of origin is of no moment to the resolution of this appeal.' [Citation omitted.]" 940 F.2d at 57.

Our Supreme Court addressed the issue in *Stone v. City of Kiowa*, 263 Kan. 502, 506, 950 P.2d 1305 (1997), when it stated:

> "There is nothing inherently wrong with a trial court's adopting a party's findings and conclusions in their entirety as long as they had been individually considered, but it is the sort of shorthand that would be susceptible to abuse. Thus, although not a practice to be encouraged, it is not, standing alone, a violation of Supreme Court Rule 165 or K.S.A. 60-252."

The district court's action of adopting Biscanin's findings of fact and conclusions of law *in toto* did not violate K.S.A. 2003 Supp. 60-252 and does not warrant our applying a de novo standard of review.

Guaranty next claims that de novo review is appropriate because there were no witness credibility issues before the trial court. Guar-

anty relies on *Bell v. Tilton*, 234 Kan. 461, 467-68, 674 P.2d 468 (1983), in which the court quoted *Stith v. Williams*, 227 Kan. 32, Syl. ¶ 2, 605 P.2d 86 (1980), and stated:

" 'Where the controlling facts are based upon written or documentary evidence by way of pleadings, admissions, depositions and stipulations, the trial court has no peculiar opportunity to evaluate the credibility of witnesses. In such situation, this court on appellate review has as good an opportunity to examine and consider the evidence as did the court below, and to determine *de novo* what the facts establish.' [Citation omitted.]"

Guaranty fails to note that a number of witnesses testified in person during the 4 days of trial on the garnishment. This argument pressed by Guaranty fails. Our task does not include second-guessing the trial judge on the credibility of witnesses who testified before him during those 4 days.

Guaranty next argues for de novo review because the district court was so arbitrary and capricious in all of its rulings that Guaranty was denied substantial justice. This rather confusing notion would have us review claimed arbitrary and capricious conduct by one standard of review, and when Guaranty prevails on those issues, begin the review process all over again using another review standard. We shudder at the prospect. Guaranty provides no legal authority for the proposition that arbitrary and capricious actions by the district court change the standard of review. We do not address an issue presented for which no supporting legal authority has been provided. *McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, 15, 61 P.3d 68 (2002); *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, 744, 822 P.2d 617 (1991).

We decline the suggestion of a de novo review of the record.

*The Trial Court's Findings of Negligence and Bad Faith*

The parties and the district court agreed that *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 261 Kan. 806, 934 P.2d 65 (1997), establishes the controlling factors for determining whether an insurer acted in bad faith or negligently in denying coverage. In *Americold*, the court stated:

"We approve the *Robinson v. State Farm Fire & Cas. Co.*, 583 So. 2d 1063, 1068 (Fla. Dist. App. 1991), factors suggested for evaluating the circumstances

surrounding an insurer's coverage denial, including: (1) whether the insured was able to obtain a reservation of rights; (2) efforts or measures taken by the insurer to resolve the coverage dispute promptly or in such a way to limit any potential prejudice to the insured; (3) the substance of the coverage dispute or the weight of legal authority on the coverage issue; (4) the insurer's diligence and thoroughness in investigating the facts specifically pertinent to coverage; and (5) efforts made by the insurer to settle the liability claim in the face of the coverage dispute." 261 Kan. at 846.

Accordingly, we examine the record to determine if substantial evidence supports the district court's findings with respect to the *Americold* factors.

### *Factor No. 1: Reservation of Rights*

Guaranty concedes that it did not send a reservation of rights letter to Simental or to the Hernandez estate. Biscanin suggests that this court should adopt the reasoning in *Griggs v. Bertram*, 88 N.J. 347, 443 A.2d 163 (1982), on this issue. In *Griggs*, the court stated:

"[O]nce an insurer has had a reasonable opportunity to investigate, or has learned of grounds for questioning coverage, it then is under a duty promptly to inform its insured of its intention to disclaim coverage or of the possibility that coverage will be denied or questioned. [Citations omitted.]

"Unreasonable delay in disclaiming coverage, or in giving notice of the possibility of such a disclaimer, even before assuming actual control of a case or a defense of an action, can estop an insurer from later repudiating responsibility under the insurance policy [Citation omitted.]

. . . .

". . . The insurer's obligation to deal in good faith also includes a 'duty of fair and full disclosure between the insured and his insurer.' [Citations omitted.] This duty necessarily requires that an insurer communicate to the insured in a timely fashion the results of any investigation. Cf. *Bollinger v. Nuss*, 449 P.2d 502, 512 (Kan. 1969) (a duty is imposed on the carrier to communicate to the insured the results of any investigation indicating liability in excess of policy limits so that he may take proper steps to protect his own interests). Such disclosure is especially important where the results of an investigation reveal a conflict between the interests of the insured and its insurer. [Citation omitted.] Failure to give prompt notice of such a conflict, or potential conflict, is inconsistent with the overriding fiduciary duty of an insurer to deal with an insured fairly and candidly so that the insured can, if necessary, protect itself. [Citations omitted.]" 88 N.J. at 357-61.

The *Griggs* court concluded:

"We therefore conclude that where, after timely notice, adequate opportunity to investigate a claim, and the knowledge of a basis for denying or questioning insurance coverage, the insurance carrier fails for an unreasonable time to inform the insured of a potential disclaimer, it is estopped from later denying coverage under the insurance policy in the event a legal action is subsequently brought against its insured." 88 N.J. at 363-64.

If the standard cited in *Griggs* applies, there certainly was evidence to support Biscanin's argument. The district court found that Guaranty was not always honest and candid with Simental. The court noted that Guaranty's adjuster sent Simental a letter stating that he needed to talk to her about the accident when he really wanted to talk to her about the issue of coverage and, more particularly, whether she answered the five policy application questions in dispute. The adjuster testified that he was hired to investigate whether misrepresentations had been made and not to investigate the accident.

The district court also noted that the adjuster sent a letter to Simental in which he stated:

"We must inform you that you are required by your policy to cooperate with us in regard to the investigation of claims. Failure to cooperate could jeopardize coverage under your policy.
"If you fail to contact us within two weeks of the date of this letter, a thorough review will be made of your policy and your coverage could be jeopardized."

The district court found that at the time the letter was sent a thorough review of Simental's policy had already been made and her policy was already in jeopardy. The district court found that this failure to disclose to Simental that her policy was already in jeopardy displayed a lack of candor when dealing with its policyholder while investigating the coverage issue.

Further, the adjuster told both Hernandez and Simental before their recorded statements that he was there to talk to them about the accident on May 24, 1997. However, he admitted at trial that these were untrue statements.

The district court also found that Guaranty was less than candid with policyholder Simental when she was not told that the purpose of her sworn statement was to ask her questions about the insurance application that relate to the coverage issue.

While substantial evidence supports the district court's finding on this first factor, the real question is whether this factor applies at all under the facts of the case. In *Glenn v. Fleming*, 247 Kan. 296, 318, 799 P.2d 79 (1990), the court adopted the burden of proof analysis set forth in *Griggs*. However, it had no occasion to endorse or reject the language in *Griggs* relied upon by Biscanin, since *Glenn* involved the insurer's rejection after suit of a within-policy-limits settlement demand, not a pre-suit investigation into coverage. And while *Glenn* cites as authority *Bollinger v. Nuss*, 202 Kan. 326, 449 P.2d 502 (1969), *Bollinger* arises from facts similar to those in *Glenn* and different from those before us today. In *Bollinger*, the court stated that an insurer has a duty "to communicate to the insured the results of any investigation indicating liability in excess of policy limits and any offers of settlement which have been made, so that he may take proper steps to protect his own interests. [Citation omitted.]" 202 Kan. at 339. This, however, is in the context of a suit having been brought against the insured seeking a judgment in excess of the insured's policy limits.

The court in *Bollinger* observed:

"It must be remembered, however, that the insured has surrendered a valuable right: that of conducting an investigation and considering possible offers of settlement. Since the absolute control of the defense is turned over to the insurer so that it may reject settlements within policy limits, and as a result, expose the insured to payment of all sums in excess of policy limits, surely it is not asking too much to require the insurer to act without negligence." 202 Kan. at 333-34.

*Bollinger* did not consider the question whether the insurer has the duty to advise its insured, before any suit is brought against the insured, that the insurer is investigating whether coverage exists under the policy. We find no Kansas case that directly addresses this point and imposes this duty upon the insurer. Unlike in *Bollinger*, the Hernandez estate had not turned over to Guaranty the defense of a suit against it. Suit was not brought against the Hernandez estate until over 7 months after Guaranty took action to rescind the policy. Kansas has so far not extended the *Bollinger* standard to pre-suit investigations. Thus, while the district court was correct in finding that Guaranty did not send a reservation of rights letter to its insured, this *Americold* factor is irrelevant to our

determination of whether Guaranty acted negligently or in bad faith.

*Factor No. 2: Efforts to Promptly Resolve Coverage Dispute*

The second factor in the *Americold* analysis is whether Guaranty made efforts to promptly resolve the coverage dispute or to act in a manner so as to limit the potential prejudice to its insured. Guaranty named only Simental as a defendant in the declaratory judgment action. Guaranty did not open an estate for Hernandez and join it as a party defendant. Despite knowing that Ortiz' widow and minor child and Glenn's family were making claims, Guaranty did not join them in the action. It is apparent that the declaratory judgment action would not have been binding upon, and therefore would not have resolved any of the coverage issues relating to, the Hernandez estate, the Ortiz claimants, Glenn's family, or National Farmers Union. See *Heinson v. Porter*, 244 Kan. 667, 671-72, 772 P.2d 778 (1989) (holding that declaratory judgment action was not binding on party not named in the action). After Guaranty filed the declaratory judgment action it acknowledged to the court that Kansas law required joinder of these various claimants and the tortfeasor but never amended its petition in order to do so. Substantial competent evidence exists to support the district court's finding that Guaranty did not take actions to promptly resolve the coverage dispute.

*Factor No. 3: The Substance of the Coverage Issue or the Weight of Legal Authority*

The third *Americold* factor is the substance of the coverage dispute or the weight of legal authority on the coverage issue. Guaranty claimed in the declaratory judgment action that Simental did not list in the policy application other members of her household, other vehicles in the household, all accidents and violations, and the identity of other drivers. Pursuant to K.S.A. 40-2,118(a), Guaranty had to prove by clear and convincing evidence that Simental knowingly and with intent to deceive signed an application she knew contained materially false statements. The district court con-

cluded that Guaranty knew, or should have known, that it was unlikely that it would be able to prove this.

There is sufficient evidence to support this finding by the district court. Guaranty's attorney took Simental's sworn statement on July 31, 1997. Simental stated that Barnes, the insurance agent, did not go over the application with her, wrote out the information himself, and did not ask her any questions other than her address and for her license. Simental stated that she did not read the application. Barnes noted in his statement that Simental spoke "broken English" and that he completed the application. Simental did not initial the line designated for her initials in the section of the application in dispute. The district court found:

> "Prior to filing its declaratory judgment action on August 6, 1997, [Guaranty] knew that the case was going to be a 'swearing match' between Simental and Barnes as to who answered the pertinent five questions on the application. [Guaranty] knew that Simental would testify that she spoke Spanish, did not read English, and therefore, was unable to read the application."

Guaranty claims it was allowed to rely on the rule that persons are presumed to know the contents of contracts they sign and will be bound by them even if they cannot speak or read English. However, as stated in *Cooley v. National Life & Acc. Ins. Co.*, 172 Kan. 10, 15-16, 238 P.2d 526 (1951):

> "The rule in this state is that an insurance agent in making out an application for insurance acts as the agent of the company and not of the applicant, and if the applicant makes truthful answers to the questions propounded, the company cannot generally take advantage of false answers entered by the agent contrary to the facts as stated by the applicant. . . . No reason is suggested, and we know of none, why an applicant for insurance, who is not asked a question contained in the application, but to which an agent enters a false answer, is not entitled to a rule as favorable as that stated."

See also *Schneider v. Washington National Ins. Co.*, 200 Kan. 380, 394-95, 437 P.2d 798 (1968) (quoting *Cooley*). Under *Cooley*, Guaranty could not rely on the answers given in the application if Barnes filled in the answers without input from Simental. And Simental's input was seriously disputed.

Before the examination under oath of Simental, she and Angel Hernandez, Theodoro's brother, gave recorded statements to

Guaranty's investigator. Absent from the Simental interview was any question about her being asked the five questions on the policy application that are the heart of Guaranty's policy defense. From these statements it is apparent that Simental had applied for a policy on the automobile involved in the accident, that the car was titled in her name, but that someone else was to be the principal driver. This does not establish, however, that Simental signed the policy application knowing that it contained materially false information. What Guaranty did learn from Simental's statement was that her English was so limited that Guaranty's investigator needed the services of interpreter Joan Simmons to conduct the interview. Without a showing that she understood the application, it was impossible to prove that Simental, with an intent to deceive, signed the application that was known to contain materially false information.

When Guaranty took Simental's statement under oath a week before filing the declaratory judgment action, it learned that she specifically denied that Barnes had asked her the five policy application questions that are at the heart of the dispute. Guaranty had hired able trial counsel to take the sworn statement and initiate the declaratory judgment action. What Guaranty's counsel later expressed to his client, and what he and Guaranty obviously knew at the time Guaranty sought to rescind the policy, was that a successful resolution of the policy issue, upon which Guaranty had the burden of proof by clear and convincing evidence, turned upon the court believing Barnes and rejecting the testimony of Simental.

The substance of the coverage dispute or the weight of legal authority on the coverage issue did not favor Guaranty under these circumstances. Substantial competent evidence exists to support the district court's decision that the third *Americold* factor supports a finding that Guaranty acted negligently or in bad faith.

*Factor No. 4: The Insurer's Diligence in Investigating the Facts*

The fourth factor in the *Americold* analysis is "the insurer's diligence and thoroughness in investigating the facts specifically pertinent to coverage." The district court noted Simental's sworn statement in which she stated that Barnes did not review the ap-

plication with her and did not ask her the five questions in dispute. The district court found that Guaranty's reliance on Barnes' claim that he asked Simental the five questions was questionable given Barnes' failure to put Simental's spouse's name, date of birth, social security number, or driver's license number on the application after marking Simental's status as married. The district court also stated that Barnes' unilateral change of the application with white out, instead of resubmitting a new application to reflect that the vehicle was an Escort instead of an LTD, is also evidence of Barnes' questionable credibility.

Guaranty's lack of diligence is evidenced by its failure to interview Ortega prior to filing the declaratory judgment action. Both Simental and Barnes stated that Ortega was at the agency when Simental applied for insurance. Guaranty did not interview Ortega until well after the declaratory judgment action had been filed. The fact that Ortega's statement did not confirm the statements of either Barnes or Simental does not detract from the district court's legitimate conclusion that the failure to even seek out Ortega before claiming fraud demonstrates a failure to diligently and thoroughly investigate the facts.

There is substantial competent evidence to support the district court's finding that the fourth *Americold* factor weighs in favor of the finding that Guaranty acted negligently or in bad faith.

### Factor No. 5: Settlement Efforts

The fifth factor under *Americold* is the efforts made by Guaranty to settle the liability claim in the face of the coverage dispute. Guaranty made no efforts to settle the Ortiz claim at any time. Guaranty claims that it was not required to settle because it had a good faith belief that coverage did not exist. *Americold* does not require the carrier to settle but does consider significant an attempt at settlement. None was attempted here. Cautionary correspondence from Guaranty's counsel after the declaratory judgment action was filed which warned Guaranty of the risk of an adverse outcome does not bear directly on Guaranty's decision to reject coverage. However, it does highlight an essential fact of litigation that is obvious to all experienced counsel and all prudent insurers:

the case has yet to be filed which is a guaranteed "slam-dunk." Risks attend every suit in which the central issue turns on the credibility of witnesses who present conflicting testimony. It is for that reason that prudence suggests some effort at settlement to mediate that risk. Guaranty did not know before suit that Ortiz was willing to settle for the policy limits of $25,000. (Guaranty learned this about 2 weeks after filing the declaratory judgment suit.) We will never know what settlement ultimately could have been achieved had Guaranty responded to the Ortiz overture with some settlement offer. However, nothing prevented Guaranty from broaching the settlement topic with Ortiz before it chose to file suit. Having failed to do so, the district court's finding with respect to this *Americold* factor is supported by substantial evidence.

There is substantial evidence to support the district court's findings with respect to all of the *Americold* factors. In view of all this evidence, the fact that the first *Americold* factor was irrelevant to the court's consideration under the particular facts of this case constitutes harmless error that does not warrant reversal. *Jones v. Reliable Security, Inc.*, 29 Kan. App. 2d 617, 625, 28 P.3d 1051, *rev. denied* 272 Kan. 1418 (2001). Thus, we affirm the district court's finding that Guaranty acted negligently and in bad faith.

*Reasonableness of the Settlement*

The district court found that Ortiz and Biscanin demonstrated that Mrs. Ortiz' settlement with the Hernandez estate was reasonable and made in good faith. The court also found that when confronted with this prima facie showing of reasonableness and good faith, Guaranty failed to meet its burden of proving that the settlement was unreasonable or collusive. We review the district court's finding of a prima facie showing of reasonableness and good faith to determine if there is substantial competent evidence to support it. On the other hand, since the finding that Guaranty failed to meet its burden after Ortiz and Biscanin made their prima facie showing is a negative finding, we review the record on this finding to determine if the district court arbitrarily disregarded undisputed evidence or if the finding was the product of bias, passion, or prejudice. *Mynatt v. Collis*, 274 Kan. 850, 872, 57 P.3d 513 (2002).

With respect to the prima facie showing that the settlement was reasonable and in good faith, the *Americold* court stated:

"Under the *Griggs* test adopted in *Glenn*, the plaintiff has the burden of initially presenting a prima facie case to establish the reasonableness of the settlement amount. We have not had occasion to provide guidance on the proof required to satisfy plaintiff's burden. However, the proof requires, at a minimum, enough information for the district court to make an independent evaluation of the reasonableness of the settlement. The test requires that plaintiffs do more than ask the district court to take on faith that the amount of the settlement is reasonable, even if negotiated under the supervision of a federal magistrate. For example, affidavits with documentation could be offered to support the amounts of the claims. In a case of this size and complexity, independent expert testimony evaluating the strengths and weaknesses of the parties' positions could be presented. We give the district court flexibility. For guidance beyond factors suggested by the facts, we recommend those listed in *Chaussee* [*v. Maryland Casualty Co.*, 60 Wash. App. 504, 512, 803 P.2d 1339 (1991)], for evaluating reasonableness:

" ' "[T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released." ' [Citation omitted.]" *Americold*, 261 Kan. at 841.

The liability of Hernandez was not in question. He crossed the center line of the highway and was severely intoxicated at the time of the accident. Ortiz was 21 years of age and employed at the time of his death. Had he lived his future income, without any pay raise until retirement, would have been $912,365.25. Discounted to present value, these lost earnings amounted to $368,548.67. Mrs. Ortiz also claimed noneconomic damages of $250,000 for herself and her minor child. Her settlement demand was $618,548, the sum of these two figures.

Vasos advised Biscanin that noneconomic loss was generally limited in Colorado to $250,000, but could be raised to $500,000 at the discretion of the judge in a post-verdict hearing. Based upon an estimate of the percentage of fault that could be attributed to Ortiz, the passenger riding with the extremely drunk Hernandez, Vasos recommended to Biscanin, and Biscanin responded to Mrs. Ortiz with, a settlement offer of $500,000 in exchange for which

Mrs. Ortiz would covenant not to execute against the estate but only proceed against Guaranty or its broker. Mrs. Ortiz accepted.

At the hearing to approve the settlement, Mrs. Ortiz testified and evidence was presented relating to the various actuarial facts and other background information necessary to support the discounted wage loss claim. Biscanin testified how he arrived at the $500,000 offer and how he discounted Mrs. Ortiz' demand by a factor of 10-20% for Ortiz' fault in riding with the drunk Hernandez. He testified that the settlement was in the best interest of the estate.

Guaranty does not claim that the finding of 10-20% fault on the part of Ortiz was unreasonable. Citing *Ling v. Jan's Liquors*, 237 Kan. 629, 703 P.2d 731 (1985), Guaranty claims that the Colorado's $250,000 cap on noneconomic damages does not apply and that the Kansas $100,000 cap applies. Guaranty misreads *Ling*. The court stated in *Ling* that "[t]he rule in this state is that the law of the state where the tort occurred—*lex loci delicti*—should apply. [Citations omitted.]" 237 Kan. at 634. Ortiz died in a Colorado accident. The Hernandez estate was exposed to a noneconomic damage claim of at least $250,000.

Guaranty also contends that since Mrs. Ortiz failed to present affidavits with documentation to support the claims and other evidence supporting the reasonableness of the settlement, the district court could not evaluate the reasonableness of the settlement. Guaranty does not suggest what specific facts the court lacked in making its evaluation. The parties used the mortality table found in PIK Civ. 3d 171.45 to determine Ortiz' life expectancy. The court heard evidence from Mrs. Ortiz regarding her late husband's income and working hours, their marriage, and their infant son. The calculation of the present value of Ortiz' earnings did not require expert testimony. See *In re Marriage of Callaghan*, 19 Kan. App. 2d 335, 338, 869 P.2d 240 (1994). Guaranty does not challenge the present value computation for Ortiz' lost wages. When, in the garnishment action, the court again considered the reasonableness of the settlement it had approved earlier, it had the benefit of the expert testimony of an able and seasoned defense lawyer,

Edward Boyle, to support its conclusion that the settlement was reasonable.

For the first time in its reply brief, and not in response to a new assertion by appellees in their briefs, Guaranty argues that Ortiz was an undocumented worker at the time of his death. Guaranty makes no effort in its reply brief to comply with Supreme Court Rule 6.05 (2003 Kan. Ct. R. Annot. 39). Accordingly, we disregard this argument.

There is substantial evidence to support the district court's determination that Mrs. Ortiz and Biscanin made a prima facie showing that the settlement was reasonable and in good faith.

*Collusion in the Settlement*

Guaranty claims the settlement was the product of collusion because at the hearing on the settlement Vasos failed to subject Mrs. Ortiz to vigorous cross-examination calculated to undermine her claim. Guaranty misconstrues the nature of the court's hearing. The hearing was to determine the reasonableness of a settlement agreed upon by the parties and recommended by their respective counsel. As noted above, the parties made a prima facie showing that the settlement was reasonable and in good faith. The parties agreed that the settlement was reasonable. Their mere agreement on the settlement does not constitute collusion. Nor does the lack of vigorous cross-examination evidence collusion. Such settlements, which pave the way for garnishment actions against an insurer who has acted negligently or in bad faith, are contemplated by the law and not condemned as per se collusive. This is why, after expressing concern over the reasonableness of settlements reached by the agreement of the parties rather than following a jury determination of damages, the court in *Glenn* adopted the protective procedure outlined in *Griggs*. *Griggs* gives Guaranty the opportunity, and places upon it the burden, to prove collusion when such a settlement has been entered into. The district court found that Guaranty failed to meet this burden.

Guaranty argues that the settlement must have been collusive since the Hernandez estate was insolvent. "The released person's ability to pay" is but one of many factors suggested for considera-

tion in *Chausse*. Further, all of these factors are described by the court in *Americold* as flexible and are offered for guidance. We find no authority for the proposition that any settlement by an insolvent defendant who has wrongfully been denied coverage for the plaintiff's claims is, based solely on defendant's insolvency, unreasonable. We are not convinced that the law imposes dual standards under which a solvent defendant can settle a claim but an insolvent defendant cannot but rather must incur the expense of a trial.

Guaranty failed to meet its burden of establishing that the settlement was the result of collusion.

Guaranty does not argue that the district court arbitrarily disregarded undisputed evidence in making its finding that Guaranty failed to meet its burden to prove the settlement was unreasonable. Therefore, we need not address this issue further. Nor does Guaranty claim that the district court arbitrarily disregarded undisputed evidence in deciding the issue of collusion. However, Guaranty does claim that Mrs. Ortiz' attorney admitted to an agreement with Biscanin to share fees and expenses. Since Guaranty's citation to the record does not support this allegation, we need not consider it further.

Finally, Guaranty's claim of bias or prejudice on the part of the district court focuses on the district court's adoption of Biscanin's proposed findings of fact and conclusions of law. Since we addressed this practice earlier, we need not consider it further. Guaranty fails to establish any other conduct on the part of the district court that constitutes bias or prejudice so as to warrant setting aside the court's findings with respect to the settlement.

## Attorney Fees

Guaranty claims the district court made insufficient findings of fact to support its award of attorney fees. While Mrs. Ortiz claims that Guaranty's failure to object to the trial court precludes review under the rule in *Hill v. Farm Bur. Mut. Ins. Co.*, 263 Kan. 703, 706, 952 P.2d 1286 (1998), Guaranty did raise the issue in oral argument of its motion for new trial, though the issue was not

raised in its written motion. Accordingly, we will review this contention.

Though the district court did not explicitly announce in its decision the factual bases for its decision to award attorney fees, it made numerous findings earlier in its opinion that support its determination that Guaranty refused to pay without just cause or excuse.

In *Smith v. Blackwell*, 14 Kan. App. 2d 158, 166, 791 P.2d 1343 (1989), *rev. denied* 246 Kan. 769 (1990), the court concluded that the trial court's findings which supported its determination of bad faith also showed a lack of just cause or excuse. That same analysis applies here. Guaranty's bad faith evidences its lack of just cause or excuse in refusing to pay.

At the hearing on attorney fees, the district court awarded $158,333.33 in attorney fees to Ortiz and Biscanin. This represents 1/3 of the excess judgment of $475,000. The court stated that the fee was to be divided between the attorneys for Mrs. Ortiz and Biscanin, and if the parties could not agree on a division, then the court would make an order. Guaranty claims the district court erred in granting attorney fees to both Mrs. Ortiz and Biscanin because Biscanin did not have any right to claim attorney fees in the garnishment proceeding.

Under the reasoning in *Blackwell*, Biscanin's right to seek attorney fees became Mrs. Ortiz' right through the garnishment proceeding. Mrs. Ortiz requested fees for her counsel of $158,333.33. Biscanin requested fees for his counsel of $160,000. The district court awarded $158,333.33, the amount sought by Mrs. Ortiz. The court also ordered the fees to be split between Ortiz' attorney and Biscanin's attorney. Mrs. Ortiz, rather than Guaranty, has an interest in the order requiring the fee to be split, and she has not complained. Thus, any error regarding the order for disposition of the fee was harmless. See *Jones*, 29 Kan. App. 2d at 625.

The focus of Guaranty's complaint about the order for fees is that the award is in the amount of the contingency fee negotiated between Mrs. Ortiz and her attorney. The district court has discretion to determine the amount of an attorney fee award, and its decision will not be disturbed on appeal absent a showing that it

abused that discretion. The party challenging the award must show that no reasonable person would agree with the decision of the district court. In deciding the reasonableness of an attorney fee, the eight factors set forth in Rule 1.5(a) (2003 Kan. Ct. R. Annot. 362) of the Kansas Rules of Professional Conduct should be considered. The district court itself is an expert in the area of attorney fees and can draw upon and apply its own knowledge and expertise in determining their value. An appellate court is also an expert on the reasonableness of attorney fees. However, we do not substitute our judgment for that of the district court on this issue unless in the interest of justice we disagree with the district court. *Davis v. Miller*, 269 Kan. 732, 750-51, 7 P.3d 1223 (2000).

Guaranty relies upon the observation in *Wolf v. Mutual Benefit Health & Accident Association*, 188 Kan. 694, 713, 366 P.2d 219 (1961), that

"[t]he statute (40-256, *supra*) provides for the allowance of a *reasonable sum* as an attorney fee to be recovered and collected as a part of the costs. It does not contemplate an amount in the nature of a speculative or contingent fee conditioned on winning the case, but only a reasonable fee for the appellee to pay his attorney for prosecuting the case."

The rule in *Wolf* must be viewed in light of KRPC 1.5(a), originally found in the Model Rules in 1970 and adopted in its current form in 1988. These provisions did not exist at the time of the *Wolf* decision. KRPC 1.5(a) states:

"(a)  A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) *whether the fee is fixed or contingent.*" (Emphasis added.)

Under KRPC 1.5(a), whether an attorney's fee is fixed or contingent is specifically listed as a factor in determining the reasonableness of an award of attorney fees. Since *Wolfe*, our Supreme Court decided *Hawkins v. Dennis*, 258 Kan. 329, 905 P.2d 678 (1995), which involved a garnishment against Kansas Farm Bureau Mutual Insurance Company to collect a judgment in excess of policy limits based on a claim of bad faith. Hawkins contracted with his attorney for a contingent fee for recovery of proceeds in excess of the policy limits. The amount of Hawkins' recovery in the garnishment was $474,864.65. The court concluded:

"If the district court's intention was to award the fee for which Hawkins was contractually obliged, the award should have been a straightforward 40 percent of $474,864.65 . . . . Forty percent of the amount of the default judgment is $189,945.86.

. . . .

". . . The judgment of the district court is modified by reducing the attorney fee award to $189,945.86." 258 Kan. at 349-50.

Thus, the Kansas Supreme Court expressly utilized the applicable contingent fee contract in determining the reasonableness of the district court's award of attorney fees.

Guaranty also claims that the award of attorney fees was improper because neither Sweeny nor Vasos submitted detailed time records. Guaranty cites no Kansas case which either requires counsel to submit detailed time records to support a fee request or which finds an abuse of discretion when the district court awards fees without detailed time records.

It is important to note that while Guaranty claims various defects in the manner in which the district court calculated the award, Guaranty does not challenge the reasonableness of the attorney fee awarded by the district court. We recall the earlier quoted language from *Wolf* to the effect that the ultimate objective of this exercise is to determine a reasonable fee. Guaranty unsuccessfully raised a similar issue in its first appeal in this case, which included the appeal of an award of $70,000 for Simental's counsel. Guaranty argued that Simental's attorney did not provide a detailed statement of his time spent on the declaratory judgment action. This court rejected that argument, finding that the trial court is an

expert on the assessment of attorney fees and was not unreasonable in its award.

Since this court's decision affirming the district court's ruling in the declaratory judgment action, the case continued for more than 2 years and included a removal and remand from the federal district court and a 4-day trial before the district court. The district court had ample evidence to draw upon in determining a reasonable fee. The district court did not abuse its discretion in its award of attorney fees.

Affirmed.